PUSEY & JONES CO. v. COMBINED LOCKS PAPER CO.

(District Court, E. D. Wisconsin. May 8, 1918.)

1. DAMAGES ☞23—BREACH OF CONTRACT BY SELLER—LOST PROFITS.

In an action for the price of a machine built by plaintiff for defendant, a counterclaim for lost profits because of delay in delivery of the machine cannot be maintained, unless special circumstances are shown with respect to which the parties must be deemed to have contracted.

2. DAMAGES ☞40(4)—BREACH OF CONTRACT BY SELLER—DAMAGES—LOST PROFITS.

The purchaser of a paper-making machine cannot set up, as a special circumstance entitling it to recover lost profits because of delay in delivery of the machine, a contract made by it for delivery of paper during five years, where by its terms it reserved the right to begin delivery at a date later than the actual installation of the machine.

At Law. Action by the Pusey & Jones Company against the Combined Locks Paper Company. On motion by defendant for new trial. Overruled.

Bloodgood, Kemper & Bloodgood, of Milwaukee, Wis., for plaintiff.
Bottum, Bottum, Hudnall & Lecher, of Milwaukee, Wis., for defendant.

GEIGER, District Judge. The complaint contains two causes of action, the first based upon a contract dated on or about May 15, 1916, whereby the plaintiff undertook to make for the defendant a paper machine for the agreed price of $120,000, according to the terms and specifications prescribed, and that the defendant, the plaintiff having furnished the machine, is indebted to the plaintiff in the sum of $31,215.19, with interest from March 1, 1917, as an unpaid balance of the agreed purchase price. The statement of the second cause of action recites the written undertaking on the part of the plaintiff, dated on or about July 26, 1916, to rebuild for the defendant a described paper machine in consideration of the payment of $23,750; that the plaintiff performed such contract, but defendant has defaulted upon an unpaid balance of the contract price, $4,890. On both causes of action judgment in the aggregate of $36,105.19 is asked.

The prima facie character of the plaintiff's demand was substantially admitted by the defendant upon the trial of the case, whereupon the

issues for trial were those tendered by the answer which set up counterclaims in substance:

That with respect to the first cause of action the plaintiff—

"failed to fulfill said contract by not delivering the machine therein mentioned on the 15th day of November as the contract provided, until the 3d day of April, 1917, when it was delivered to the carrier in uncompleted shape; that by reason of said delay, and the failure of the plaintiff to deliver the said machine in the time provided in said contract, and the resulting inability of the defendant to make use of said machine during the period of delay caused by the plaintiff in noncompliance with said contract, the defendant suffered great damages, namely, in the amount of thirty-four thousand four hundred ten dollars and seventy cents ($34,410.70), which damages were the direct result and entirely caused by the failure of the plaintiff to fulfill said contract as it, the plaintiff, was obligated to do, and that all of his damages necessarily resulted from default, negligence, and violation of this contract by the plaintiff."

In respect of the second cause of action the defendant alleged that the machine to be repaired was to be so repaired and delivered to transportation lines at Fitchburg, Mass., on November 1, 1916; but—

"that the plaintiff delayed the delivery of said repaired machine as provided in said contract until the 20th day of February, 1917; that by reason of said delay and the resulting deprivation of the use of said machine by the defendant, the defendant suffered great damages and losses, namely, the sum of eight thousand four hundred dollars ($8,400), all of which damages and losses were directly caused by the direct and necessary result of said plaintiff's delay in the fulfillment of said contract."

A further set-off and counterclaim, based upon alleged expenditures made by the defendant on account of supplying missing parts from the machine, traveling expenses, and the like, in the sum of $1,733.85 is offered, and the answer demands judgment for a dismissal of the complaint, and for judgment in the sum of $16,544.55, being, I assume, the excess of the damages set out in the counterclaim beyond the sum which by the answer is admitted to be due to the plaintiff.

Upon the trial of the case the defendant undertook to establish its counterclaim by evidence, most of which was tentatively received, subject to objection, but practically all of which was subsequently stricken out, whereupon a verdict was directed in favor of the plaintiff and against the defendant, and a motion for a new trial, which has been argued, presents for review the various rulings of the court upon the rejection of evidence, which led to granting the motion for a direction of verdict and a dismissal of the counterclaim.

A consideration of the motion must be addressed, first, to the general contentions of the defendant respecting the rule of recovery upon contracts such as are involved in the case, and, secondly, a consideration of the facts tendered in evidence with a view of determining whether, in any aspect, they furnish a basis for an award of damages by the jury upon the theory and the only theory offered and insisted upon by the plaintiff.

It will be observed from the pleadings that the defendant framed the counterclaims, excepting the last, solely upon the hypothesis of seeking recovery under a general rule of damages. There is no inti-

mation in the pleading, except as noted, of any claim of recovery, except the general damages sustained by the defendant through a deprivation of the use of the machine during the delay period; and this brings us at once to a consideration of the bill of particulars demanded by the plaintiff of the defendant prior to the commencement of the trial. It is as follows:

| | | |
|---|---:|---:|
| Per ton profit 22½-pound paper made on 176-inch machine, contract No. 1331 .............................................. | | $9.78 |
| Daily tonnage produce........................................ | | 30 |
| Delay on shipment, December 1, 1916, to April 3, 1917.......... | | 110 days |
| 110 days x 30 tons ........................................... | | 3,300 tons |
| 3,300 tons x $9.78..................................$32,274.00 | | |
| Payments to Valley Iron Works, Appleton, Wis., for material to replace imperfect or unfinished parts called for in purchase contract........................ | 327.30 | |
| Cash advanced to Pusey & Jones Company............. | 50.00 | |
| Total ..............................................$32,651.30 | | |
| Contract No. 1340 would have increased production from November 1 to February 20..................................... | | 281.7 tons |
| Profit on increased production........................ | $8,119.26 | |
| Expense L. L. Alsted to Wilmington, Del., January 13, 1917 ........................................... | 187.48 | |
| Service and expense Pittsburg testing laboratory at Wilmington and Pittsburg............................. | 1,292.26 | |
| Express charges on delayed material covered by contract | 254.11 | |
| | $9,853.11 | |
| Interest on money actually expended on contracts 1331 and 1340 and on plant and equipment from date when delivery should have been made to delivery when same was actually made..... | | $7,500.00 |

In explanation of references in this bill, it may be said that the first items, under "Contract No. 1331," are pertinent to the first cause of action of the complaint and to the counterclaim averring a breach through a delay of furnishing the new machine, and that the second items, under "Contract No. 1340," are pertinent to the second cause of action of the complaint and to the counterclaim for damages for delay in repairing and shipping the old machine; whereas the last item is evidently intended to speak for itself as an interest item on purchase-money expenditures, and "on plant and equipment from date when delivery should have been made to date when delivery actually was made."

[1] It may be noted at this time that even in the bill of particulars the defendant is silent respecting a claim for profits based upon "special circumstances" subsequently sought to be introduced in evidence on the trial. This will be seen to be of importance, unless the court was wholly in error in rejecting the notion that profits as profits are recoverable only upon the basis of some special circumstances with respect to which the parties must be deemed to have contracted. Obviously, it is immaterial if, as defendant's counsel contends, profits are always recoverable as profits—as anticipated gains—in any action for breach of contract. This observation should be borne in mind in a consideration of the evidence respecting the defendant's dealings

with third persons pertaining to its paper output on the basis of its new installation and remodeled paper plant.

Giving to the defendant's evidence of oral communications by its officers to officers or agents of the plaintiff, prior to the execution of the written contracts in suit, the most favorable view, it is in brief:

That, approximately six weeks or two months before the contracts were signed, its president inquired of plaintiff concerning the latter's ability to make a paper machine, whereupon an interview was had in which the former disclosed to agents of the latter, in a general way, its interest in a new machine, contingent, however, upon further consideration of the matter of building a new, or remodeling its old, plant, and in a like general way the broad contingency of first ascertaining the likelihood or certainty of disposition or sale of its manufactured product. Evidently defendant's consideration of these matters—which, of course, was for itself—reached such a state of certainty that a further interview, or possibly two, which, in point of time, immediately preceded actual execution of the contracts, were had. Aside from negotiation pertaining to price, mechanical and structural detail of machine, the defendant's witnesses claim that at this latter interview or interviews there was communicated to the plaintiff's agents the fact that they now had contracts for the sale or disposition of the output of the proposed new machine; that such contract or contracts were referred to as the Sears-Roebuck contracts, or that the paper to be manufactured was for Sears, Roebuck & Co.; and one witness stated that he told plaintiff's agents such contract was to run for five years from January 1, 1917. The machine was intended to be used for making catalogue paper.

This testimony contained the first intimation in the case that defendant claimed the existence of specific contracts with third persons, knowledge whereof was communicated to the plaintiff as specific circumstances with reference to which the parties contracted, and as a result whereof the defendant, because of the breach, was entitled to recover as special damages the specific profit which could have been realized upon the sale of paper possible to have been manufactured during the delay period of the delivery of the machines; and the plaintiff objected to the reception of this testimony upon the specific ground that the pleadings, including the bill of particulars, did not justify its admission. The defendant, while suggesting its desire to amend, if its pleadings were not broad enough, did not in fact make an application to enlarge its pleadings. The court intimated that the objection interposed by the plaintiff seemed pretty good; but, it is believed that other considerations hereinafter presented dispense with the necessity of dealing with the merit of this specific objection.

[2] The defendant, in further effort to prove its damages, thereupon offered certain contracts, which in fact constituted the "special circumstances upon" which it sought recovery of profits. These will be considered:

First, a contract between the defendant and Bermingham & Seaman Company, of Chicago, whereby the defendant undertook to manufacture and deliver paper covered by the former's "contracts with

Sears, Roebuck & Co. as shown by copies, samples and blue prints, which are annexed hereto, to all the terms and conditions of which we hereby agree," viz.:

1—Contract dated April 11, 1916, for output of Little Chute mill, or its substitute plant, approximately 45,000 tons white catalogue paper.
2—Contract dated April 17, 1916, for approximately 15,000 tons white catalogue paper.
3—Contract order No. 4365, dated May 1, 1916, for approximately 2,500 tons yellow index paper, etc.
4—Contract order No. 4363, dated May 1, 1916, approximately 10,000 tons white catalogue paper.
5—Contract order No. 4364, dated May 1, 1916, 10,500 tons white catalogue paper.

Such contract contains further details respecting price and the adoption of the Sears-Roebuck contracts as prescribing terms of payment.

It thus appears that the defendant claims to have undertaken for Bermingham & Seaman Company the manufacture and delivery of paper claimed to have been contracted by the latter for manufacture and delivery to Sears, Roebuck & Co.

Secondly, in view of the fact that the defendant expressly adopted them, the terms of the two contracts—there being three so-called order contracts, presumably given under the principal contracts—are important as evidencing the obligations in fact assumed by Bermingham & Seaman Company toward Sears, Roebuck & Co. One of the contracts, dated April 11, 1916 (in evidence as Exhibit 5), and under which I believe the three so-called "order contracts" were given, contains, among other, the following provisions:

"We propose to furnish you the entire output of 22½-pound No. 1 white catalogue paper of the Little Chute division of the Combined Locks Paper Company, located at Little Chute, Wis., subject to the following specifications and conditions:
"(1) Duration of contract to be five years from January 1, 1917, providing we succeed in erecting plant and have the same running by that time or five years from actual date the plant starts operation, which will be not later than June 1, 1917.
"(2) Approximate annual quantity, 9,000 tons."

The second contract appears to be dated April 17, 1916, and contains the following proposal by Bermingham & Seaman to Sears, Roebuck & Co.:

"We propose to furnish you a part of the output of 22½-pound No. 1 white catalogue paper of the Combined Locks Paper Company, located at Combined Locks, Wis., subject to the following specifications and conditions:
"(1) Duration of contract to be five years from January 1, 1917.
"(2) Approximate annual quantity, 3,000 tons."

It will suffice to refer to the contracts entered into between the defendant and the plaintiff for the manufacture and repair of the machines, by noting merely their provisions respecting date of delivery—that for the manufacure and sale of the new machine being given as during the month of November, and that for the repair of the old machine being November 1st—and the further significant provision in each contract giving to the plaintiff 60 days' time for assembling, erect-

ing, and fully installing both machines from and after their shipment, such time being subject to enlargement for cause specified.

Assuming that the legal effect of this testimony must now be considered as though it were in fact before the court, it necessitates the adoption of some rule of damages upon the case as made by the pleadings or upon pleadings and the proffered evidence; and, as indicated, it is not necessary to rest the ruling upon any possible merit of the special objection made by the plaintiff to the admissibility of this testimony, because no sufficient basis was laid in the pleading. Neither is it necessary to consider the variant rules of damages arising upon contracts of sale or of manufacture and sale. It is not necessary— and, if it were attempted, it could not be done—to frame a broad general rule, negative in its character, that profits as profits can never be recovered, or that they may not indirectly be pertinent evidence under some other rule or measure of recovery.

It is, however, proper to bear in mind the necessity in every case of adopting the most certain rule of recovery. It is thus stated by Mr. Mechem, in his work on Sales (volume 2, § 1779):

> "And so, as between two possible methods by which the loss might be computed, the law prefers that which leads to the more certain and least speculative results. Thus, as has been seen, the damages to be recovered for not supplying a machine or other article as agreed are usually the market value for which another may be procured, and not the profits which might have been made from its use. And for like reasons the damages to be recovered for the loss of the use of the property are to be estimated with reference to rental value or fair interest upon investment, and not upon the uncertain and speculative basis on the profit which might have been made from its use."

The principles relating to the adoption of a rule of damages to be satisfied by a calculation of profits which a machine bargained for might have made during a delay period are so fully discussed in the two cases of Howard v. Stillwell & Bierce Manufacturing Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147, and Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 23 Sup. Ct. 754, 47 L. Ed. 1171, that the ruling in the present case, unless it can be justified upon their application to the facts before us, cannot be justified at all; and it may be noted that both of these authorities, and it is believed the great weight of all adjudications, treat the recovery of profits as possible only under exceptional circumstances, unless the engagement by its very terms discloses them to have been in effect, in whole or in part, a subject-matter of the bargain. In the Globe Case, after discussing the question respecting the absence in a contract of language appropriately disclosing items of damage within the contemplation of the parties in case of breach, Mr. Justice Holmes uses this language:

> "It is true that as people, when contracting, contemplate performance, not breach, they commonly say little or nothing as to what shall happen in the latter event, and the common rules have been worked out by common sense, which has established what the parties *probably would have said if they had spoken about the matter*. But a man never can be absolutely certain of performing any contract when the time of performance arrives, and in many cases he obviously is taking the risk of an event which is wholly or to an appreciable extent beyond his control. The extent of liability in such cases i[

likely to be within his contemplation, and whether it is or not, should be worked out *on terms which it fairly may be presumed he would have assented to if they had been presented* to his mind."

Again:

"We have to consider, therefore, what the plaintiff would have been entitled to recover in that case, and that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made."

He proceeds:

"This point of view is taken by implication in the rule that 'a person can only be held to be responsible for such consequences as may be reasonably supposed to be in the contemplation of the parties at the time of making the contract'" (citing cases).

And further:

"The question arises, then, what is sufficient to show that the consequences were in contemplation of the parties in the sense of the vendor taking the risk? It has been held that it may be proved by oral evidence when the contract is in writing [citing cases]. But, in the language quoted, with seeming approbation, by Blackburn, J., from Mayne on Damages (2d Ed.) 10, in Elbinger Actien-Gesellschaft v. Armstrong, L. R. 9 Q. B. 473, 478: 'It may be asked, with great deference, whether the mere fact of such consequences being communicated to the other party will be sufficient, without going on to say *that he was told he would be answerable for them, and consented to undertake such liability.*' Mr. Justice Wills answered this question, so far as it was in his power, in British Columbia Sawmill Co. v. Nettleship, L. R. 3 C. P. 499, 508: 'I am disposed to take the narrow view that one of two contracting parties ought not to be allowed to obtain an advantage which he has not paid for. * * * If a liability for the full profits that might be made by machinery which the defendant was transporting, if the plaintiff's trade should prove successful and without a rival, had been presented to the mind of the ship owner at the time of making the contract, as the basis upon which he was contracting, he would at once have rejected it. And, though he knew from the shippers the use they intended to make of the articles, it could not be contended that the mere fact of knowledge, without more, would be a reason for imposing upon him a greater degree of liability than would otherwise have been cast upon him. To my mind, that leads to the inevitable conclusion that the mere fact of knowledge cannot increase the liability. The knowledge must be brought home to the party sought to be charged, *under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it.*'"

The Bierce Case announced a like view. That was an action for damages occasioned through the delay in remodeling a flour mill and installing a new type of milling machinery. It was sought to recover as damages the profits which would have resulted through an operation of the mill in particular in grinding up a stock of grain which the vendee had on hand, and the court, after ruling that the loss of such profits was speculative and remote, not resulting immediately from the alleged breach of a contract which contained no stipulation that profits would be made on flour from the wheat ground up by the machinery contracted to be furnished and erected, adds this as a final statement:

"Nor were there any special circumstances attending the transaction from which an *understanding between the parties could be inferred* that the plaintiff was to make good any loss of profits incurred by a delay in furnishing and putting up such machinery according to the terms of the contract."

The general principle announced in these cases—and I am satisfied that it is the general principle sought to be applied in all cases—brings us to their applicability in the present situation upon testimony establishing three propositions of fact:

First. Upon their face, the contracts between the plaintiff and the defendant themselves negative the thought that the Bermingham-Sears-Roebuck contracts, whose life began January 1, 1917, were, in respect of the time of commencement, deemed to be of the essence of the machine contracts; for by the principal of the latter contracts the defendant, in any event, had until February 1, 1917, to install the machine, and the contracts prescribed the consequences which should ensue a delay in installation, namely, a postponement of the maturity of two of the purchase-money notes.

Second. The Bermingham-Sears-Roebuck memorandum (Exhibit 5), which, of course, must be read into the contract of the defendant with the Bermingham-Seaman Company, contains this provision:

"We propose [to furnish, etc.] subject to the following specifications and conditions:

"(1) Duration of contract to be five years from January 1, 1917, *providing we succeed in erecting plant and have same running by that time, or five years from actual date plant starts operation, which will be not later than July 1, 1917.*"

Third. Closely related to the last above is this: There is not a syllable or suggestion in the evidence that by reason of the delay the defendant in fact defaulted upon the contracts constituting the "special circumstances"; nor is there any proof that it was in fact disenabled from fully carrying out the terms of the contracts from and after the deferred date, July 1, 1917. In short, the second consideration above shows that the so-called special circumstance—the existence of a contract with a third person, communicated to the plaintiff—was inherently not a special circumstance because its life, while nominally beginning January 1, 1917, was made contingent in its commencement upon the very circumstance of delay which is at the foundation of the present action. In other words, the contract, while nominally dating from January 1, 1917, was ambulatory.

Upon the trial of the case some of the matters above pointed out were referred to as a basis of the court's ruling. The court said, in discussing the exceptional cases noted in the two cases cited:

"The exceptions, if they exist at all, require great particularity of evidence to support the proposition that the vendor, the manufacturer, was apprised of those [them] with such certainty that he ought not in fairness and in justice to be heard to say that he did not have in mind—that both parties did not have in mind—the contemplated loss which would ensue through a failure to regard time as of the essence of the contract. Now, there is no suggestion here that Pusey & Jones could in fairness be said to have been acquainted with the idea, which is now sought to be pressed; that a failure to have this machine in place November 1st, December 1st, January 1st, or February 1st, should entail the consequences of a guaranty or an indemnity against loss of profits upon contracts which certainly were not communicated to them except in this very general way."

Again:

"The evidence offered so far is not such that the court or this jury should be heard to say 'why Pusey & Jones understood that the Combined Locks

Company were to lose $9.78 a ton' because the talk was of a general nature. It is a talk which could be indulged in, and usually is indulged in, in negotiations for this sort of a repair or a sale, and the rule, if extended upon the strength of such general testimony as that, simply amounts to no rule at all—simply amounts to superseding the contract. Now, that the parties here had in mind anything of that kind I do not believe should be left open to inference upon the testimony offered so far."

Coming, therefore, to a direct application of the principles, and upon evidence which negatives with particularity the idea that the parties contemplated the consequences of a loss of profits, is it possible to permit a jury to infer, nevertheless, that both parties contemplated such consequences as fully as though they had really agreed thereto? It seems absurd to say that a contract containing a nominal date, January 1, 1917, even standing alone, should be made the basis or should be considered as a special circumstance justifying an award of special damage, merely because its existence was communicated to the vendor when the vendor and vendee entered into formal contracts which on their face give the vendor a leeway in performance, extending very substantially beyond the date of the special circumstance contract. But when it appears that the date, January 1, 1917, was, after all, not binding upon the vendee, that by an express proviso of the contract he had relieved himself by getting six months' leeway in order to meet the precise contingency which has arisen in the present case, namely, a delay in installing machines, it is not only idle, but it would be monstrously unjust, to permit him, to impose upon the vendor consequences which might have ensued had the vendee's contract with the third person been binding as of the earlier date.

This situation impresses me as a fundamental obstacle to the application of the general principle controlling an award of special damages involving profits as such, which a machine might have earned. In other words, no matter how clearly it may have been the desire, hope, or expectation of the defendant to have the machine installed by January 1st, it very clearly and by the express terms of the Sears-Roebuck contract contemplated the possibility, if not the probability, of being unable to have it at that time. Therefore, having such contemplation from its side, can it be heard to say that the plaintiff here did not contemplate, or, upon full disclosure of the facts, would not have contemplated, the very same thing, but, on the contrary, contemplated its rigid responsibility to the defendant for loss of profits upon a contract which, by express reservation and proviso, the defendant was not obliged to perform on or begin performance until six months later. As I understand the rule, the contemplation of one of the parties is not sufficient; it must be a mutual and reciprocal contemplation produced by such particularity of attendant circumstances as should preclude both parties from saying that they were not, in effect, in law incorporated into the engagement.

We are brought to the next consideration, that the defendant did not, and could not, default upon its contract with Bermingham & Seaman, and therefore did not and could not, prior to July 1, 1917, lose any profit which it might have made upon the sale of the product to be manufactured pursuant to that contract. The most to be said is that it did not *enjoy* such profits from and after the earlier date. It

does not and cannot claim that plaintiff's delay entailed a breach of its contract with Bermingham & Seaman, resulting in a loss of profits upon that contract, because it was within its right, as already observed, to simply move the date of commencement forward, not exceeding six months, and presumably that is just what was done. In other words, the notion of special damage, because of an actual loss of profits, is wholly negatived.

It is unnecessary to consider whether the defendant might not, upon some other theory, have established a claim for damages because of the delay. The course of the trial, in connection with the offer and rejection of the testimony upon the items of defendant's bill of particulars, brought it to the position where, its testimony respecting profits as such having been rejected, it was obliged to substantiate the other items upon some variant theory of damage. But it formally declined to proceed with any offer of proof to support, for example, a claim for deprivation of the use of the machine, to be measured either by interest upon the contract price, or upon payments made, or by some other standard, and formally elected to rest its whole case upon its offer to show loss of profits. In this situation there was no alternative, except to direct the verdict in favor of the plaintiff, both upon the complaint and upon the counterclaim.

I am satisfied to adhere to the ruling upon such motion for direction, and the motion for a new trial will be denied; and an order may be entered accordingly.