Hippard Coal Company, Appellant, v. Illinois Power and Light Corporation, Now Named Illinois Iowa Power Company, Appellee.

Opinion filed December 10, 1942.

C. C. Dreman, of Belleville, for appellant.

Johnson & Johnson, of Belleville, and Omer Poos, of Hillsboro, for appellee.

Mr. Justice Bristow delivered the opinion of the court.

The plaintiff, Hippard Coal Company, operated a coal mine near Belleville, Illinois. On August 15, 1934, it entered into a written contract with the defendant, Illinois Power & Light Corporation, for the purpose of securing electrical energy to operate the equipment in its coal mine. Under this contract the Power Company agreed to "stand ready to supply to (plaintiff) during the term of the agreement approximately 75 kilowatts of approximately 2300 volts, 3 phase electrical energy." The agreement further provided that "the point of delivery at which electrical energy shall be supplied, measured and accepted hereunder shall be at primary side of company's substation on consumer's premises." This contract provided that it was subject to the rules and regulations of the Illinois Commerce Commission governing the furnishing of electrical energy.

On August 17, 1934, a second agreement was entered into between the parties in the form of a letter written by the defendant and accepted on its face in writing by the plaintiff. This agreement referred to the power service agreement of August 15, 1934, and then provided as follows:

"Metering at 2300 volts presumes customer ownership of any transformers necessary to supply current at voltages less than 2300 volts. In your case the voltage is 440 volts. The Illinois Power and Light Corporation has supplied the necessary substation and stepdown transformers on the assumption that you would prefer to pay rental in this equipment in

preference to making the capital investment required to own the equipment outright.''

The balance of the letter gave the value of the substation and stepdown transformers as $625. Fifteen per cent (15%) of this value was taken as the rental basis for a year which would amount to $93.75, and when prorated on a monthly basis would give a rental of $7.81 per month, which was to be added to plaintiff's bill as substation and transformer rental.

Plaintiff's fourth amended complaint charged a breach in the agreement of August 15, 1934, in that defendant failed to furnish electrical energy of approximately 75 kilowatts of approximately 2300 volts on the primary side of the transformers installed by the defendant, and breached the second agreement of August 17, 1934, by failing to furnish 440 volts of electricity at 75 kilowatt capacity on the secondary side of the stepdown transformers installed by the defendant, and that as a result plaintiff could not operate its mine properly, causing loss in the operation thereof, damage to its machinery and loss of profits by reason of a diminution in production of coal which plaintiff could have mined and sold.

The jury returned a verdict for $20,000 against the defendant. Defendant's motion for a judgment notwithstanding the verdict was granted by the trial court. Judgment was entered for the defendant. Plaintiff has taken the appeal.

The question to be decided is whether the court erred in granting defendant's motion for judgment notwithstanding the verdict.

The evidence, in its aspect most favorable to the plaintiff, shows the defendant extended its primary line carrying 2300 volts to plaintiff's mine. For the purpose of stepping down the voltage from 2300 volts to 440 volts, defendant installed the necessary substation and 2–30 K. V. A. General Electric trans-

formers. These were standard equipment and had a rating of 2200 volts on the primary side and 440 volts on the secondary side. From the transformers last mentioned the power line passed through 3–15 K. V. A. transformers put in by the plaintiff which stepped the voltage down from 440 to 220, and the power line then carried power at 220 volts to the coal cutting machine used in the mine.

Defendant began furnishing power in October 1934. Plaintiff began to experience difficulty with the operation of its coal cutting machine in November 1934. The machine would heat up and slow down and at times the operators had to stop and let the machine cool. The result was where the machine could previously cut six or seven places of coal per day, the operators could cut only two or three places per day.

Plaintiff's secretary testified that he complained about the difficulty with his machine to the office manager of the defendant in November 1934, in December 1934, and again in February 1935. In September 1935, he talked to the general manager of the defendant with reference to the same difficulty experienced in the operation of the machine. He further testified that tests were taken and after such tests were taken the 2–30 K. V. A. transformers were replaced with 2–50 K. V. A. transformers with no load voltage of 520 volts; that after the transformers were changed the cutting machines operated satisfactorily; that the new transformers were installed in November 1935. These new transformers gave a freak high voltage and abnormal nonstandard voltage. They were rated 220 volts on the primary and 488 volts on the secondary side.

On September 25 and 26, 1935, the defendant made tests of the 2–30 K. V. A. transformers with a Bristol volt meter recording instrument. The results of these tests were recorded on charts which were introduced in evidence as plaintiff's exhibits 4 and 5.

Plaintiff called as his witness Albert Kaufman, an electrical engineer, who testified with reference to the tests made. He examined plaintiff's exhibit 4 and testified that the voltage variation ranged from a high of 500 volts to a low of 405 volts. He examined plaintiff's exhibit 5 and stated that such charts showed that the voltage varied from a high of 510 volts to a low of 350 volts. Under the Illinois Commerce Commission rules, to which the contracts were subject, a variation of 10 per cent was allowable. Kaufman testified that where the chart showed a low voltage of 350, it indicated that such voltage was of short duration, but that there was a repetition thereof, and that he fixed the maximum length of time of such low voltage at about three or four minutes. This exceeded the Illinois Commerce Commission rule which permitted a variation from the 10 per cent provided the period did not exceed one minute. On cross-examination Kaufman testified that when there was a use of power the chart would show a slight variation from 440; although he did not regard a 10 per cent variation as good operation, he would have to abide by the commission ruling, that he would grant it was awful hard to tell from the chart (Bristol) the three or four minute maximum he mentioned, as it was just a matter of a slip or stroke of the pen and he just had to guess at it. He made no attempt to figure average voltage of a period of time. Defendant's expert read the two charts and gave as his opinion that exhibit 4 showed a low of 440 volts and a maximum of 470 to 475 and exhibit 5 showed the same range.

Plaintiff's secretary testified with reference to the damages sustained, in substance, that because of the low power during the period in question from November 15, 1934 to November 31, 1936, it cost them $1.69 per ton to mine 16,340 tons; that if the machine had been working properly it would only cost them $1.29 per ton to mine such amount, and that the

difference in cost, because of the poor operation of the machine, would be $6,536. He also testified that if the machine had been working properly they could have mined an additional 13,180 tons during the same period, and that such coal could have been sold and that the value thereof would be $6,628. The only other item of damage he claimed was that they had burned out a motor on their cutting machine which cost about $250. This makes a total damage claimed of $13,414.

To determine whether the trial court was correct in its ruling on the defendant's motion for a judgment notwithstanding the verdict, or whether the plaintiff was entitled to a judgment on the verdict of the jury, we must consider the two contracts involved in this case, Exhibits A and B:

*Contract No. 1, Exhibit A.* This is an "Electric service agreement," and it deals primarily with the supply of electrical energy to the plaintiff. The defendant agreed to furnish plaintiff 75 kilowatts at approximately 2300 volts of three-phase electrical energy.

This contract did not involve the furnishing or supplying of equipment. The main purpose of this contract was to make available to plaintiff sufficient electrical energy to enable it to operate its coal machines.

All of the evidence in this record is to the effect that the defendant supplied 75 kilowatts at approximately 2300 volts at the point of delivery provided for in this agreement. There is no evidence in the record that the company breached this agreement in any respect.

In the first agreement we find plain, simple language, which requires the defendant to supply 75 kilowatts of approximately 2300 volts at a definite point of delivery. This is a definite obligation, and plainly stated. The parties employed adequate language in this agreement to show what the respective obligations and responsibilities of the parties were.

For instance, the agreement recites: "Company (defendant) shall stand ready to supply the customer during the term of this agreement, approximately 75 kilowatts of approximately 2300 volts, three-phase electrical energy." Again the agreement recites:

"The point of delivery at which electrical energy shall be supplied and accepted hereunder, shall be at the primary side of company's sub-station on consumer's premises."

and, as we have already said, the evidence fails to show any violation of this agreement.

*Contract No. 2, Exhibit B.* This contract is an entirely different form of agreement. Unlike the first contract, it is in the form of a letter. An examination of the agreement fails to show any language whatever which defines the liability of the defendant, or in any way specifies what it is required to do or furnish the plaintiff under it. It fails to show that the defendant undertook to do any specific thing except this—to secure for the plaintiff standard stepdown transformers which will have the ability to cut the voltage to 440 volts.

In other words, it was decided to cut the voltage to 440 volts, the defendant secured standard equipment for that purpose and rented it to plaintiff. All the defendant agreed to do was to supply "the necessary sub-station and stepdown transformers" to reduce the voltage from 2300 to 440.

Giving it this language, the most liberal meaning or construction or interpretation, the only obligation the defendant assumed thereby was to furnish stepdown transformers that were *capable of reducing the voltage to 440 volts.* This it clearly appears was done. The charts, exhibits 4 and 5, clearly show that the transformers were capable of cutting the voltage from 2300 to 440.

The defendant did not agree by this writing to supply equipment which would at all times operate and maintain the current at 440 volts.

This agreement speaks of 440 volts in only one place. The agreement says, "in your case, the voltage is 440 volts." This at best is merely a recital of plaintiff's requirements.

The defendant, by the quoted language, does not undertake to supply anything except transformers which will be capable of reducing the voltage to 440 volts. It is unlike the first agreement, because the first agreement contains definite language by which the defendant assumes the responsibility of supplying a definite and certain amount of electrical energy at a consideration that is stated therein.

In the second contract the defendant's duty in that respect is not defined by any language that appears therein, and there is nothing in the second agreement from which any such obligation or responsibility can be inferred. It is entirely silent on that subject.

According to the undisputed evidence, it appears that the equipment secured by the defendant and furnished the plaintiff was standard equipment. It was not manufactured by the defendant, and it did not in any way guarantee the performance of that equipment. There is no language in the second agreement guaranteeing the performance of the equipment, nor is there any language in it from which any such guarantee may be inferred.

It is plain, therefore, that no breach occurred in connection with this agreement.

To hold the plaintiff liable for the damages claimed would require us to write into the second agreement provisions which the parties themselves did not contemplate and did not incorporate in the agreement which they made. It is the judicial province of courts

to enforce the contract as the parties have made it, without inserting conditions which the parties have not made. *Hanover Fire Ins. Co. v. Orr,* 56 Ill. App. 621, aff'd 158 Ill. 149; *Siegel, Cooper & Co. v. Colby,* 61 Ill. App. 315, aff'd 176 Ill. 210.

If the foregoing conclusion that the contract is not broad enough to cover the liability claimed is correct, then it is immaterial and unnecessary to consider the damage, if any, sustained by the plaintiff, whether it be loss of profits, increase in cost of production, or merely nominal.

However, assuming that the second contract is broad enough to require the defendant to maintain and supply at all times 440 volts, a prima facie case of liability would exist against the defendant, but the damages sought to be proved in this case by the plaintiff have been held to be not provable under the authorities because of the speculative character of such damages, and because it is said that they are not within the contemplation of the parties at the time the agreement was made.

To illustrate, in the case of *Pusey & Jones Co. v. Combined Locks Paper Co.,* 255 Fed. 700, the defendant ordered a paper machine from the plaintiff and agreed by its contract to deliver such machine within a certain time. For some reason the delivery of the machine was delayed. The plaintiff sued for the price of the machine and the defendant filed a counterclaim claiming damages by reason of such delay depriving the defendant of the use of the said machine, which resulted in loss of profits which it could have made had the machine been delivered on time. The following quotations from the case are pertinent. On page 705 the court quotes from Mechem as follows:

"And so, as between two possible methods by which the loss might be computed, the law prefers that which leads to the more certain and least speculative results.

Thus, as has been seen, the damages to be recovered for not supplying a machine or other article as agreed are usually the market value for which another may be procured, and not the profits which might have been made from its use. And for like reasons the damages to be recovered for the loss of the use of the property are to be estimated with reference to rental value or fair interest upon investment, and not upon the uncertain and speculative basis on the profit which might have been made from its use.''

The case referred to the case of *Howard v. Stillwell & Bierce Mfg. Co.*, 139 U. S. 199, and the *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U. S. 540, and says:

''And it may be noted that both of these authorities, and it is believed the great weight of all adjudications, treat the recovery of profits as possible only under exceptional circumstances, unless the engagement by its very terms discloses them to have been in effect, in whole or in part, a subject matter of the bargain.''

On page 706, the court said:

''The Bierce case announced a like view. That was an action for damages occasioned through the delay in remodeling a flour mill and installing a new type of milling machinery. It was sought to recover as damages the profits which would have resulted through an operation of the mill in particular in grinding up a stock of grain which the vendee had on hand, and the court, after ruling that the loss of such profits was speculative and remote, not resulting immediately from the alleged breach of a contract which contained no stipulation that profits would be made on flour from the wheat ground up by the machinery contracted to be furnished and erected, adds this as a final statement:

'' 'Nor were there any special circumstances attending the transaction from which an understanding be-

tween the parties could be inferred that the plaintiff was to make good any loss of profits incurred by a delay in furnishing and putting up such machinery according to the terms of the contract.' "

A similar situation was presented in the case of *Sanford Coal Co. v. Wisconsin Bridge & Iron Co.*, 293 Fed. 735, and the rule in the 255 Federal case was followed. In the *Sanford Coal Co.* case the defendant operated a coal mine. Plaintiff agreed to furnish defendant a tipple and other equipment for defendant's coal mine by July 1, 1920. For some unexplained reason the tipple was not furnished until late in October 1920. Defendant in its counterclaim asked for damages for failure to deliver the tipple on time and claimed that had the new tipple been installed on the date agreed upon, they could have mined 6,188 tons during July 1920, and because of the insufficiency of the temporary tipple only 3,670 tons were mined. They claimed damages for loss of profits for the coal which could have been mined and sold if the new tipple had been furnished on time. The court held that such profits could not be recovered as an element of damage and followed the 255 Fed. 700 case.

The rule recognized in the Federal cases has also been recognized in Illinois. See *Frazer v. Smith,* 60 Ill. 145. In this case the defendant agreed to repair an alcohol still within a period of six weeks from the date of the contract. Plaintiff claimed that defendant failed to repair the still within the time specified, and was deprived of the use of it for two months, during which time he might have and would have manufactured large quantities of alcohol from which he would have derived great gains. The court held that the measure of damages is not prospective gains and such loss of profits could not be considered an element of damages under such a contract.

In *Sipes v. Barlow,* 197 Ill. App. 239, prospective profits were held too remote and speculative and not the measure of damages which should be applied.

This is an abstract decision.

In *Howe v. Fulton*, 225 Ill. App. 589, the plaintiff sued for the balance due for furnishing and installing a refrigerating plant in a storage house owned by the defendant. Defendant filed a set-off claiming that the plaintiff failed to install the machinery within the period provided in the contract, and by reason thereof was deprived of the use and benefit of his building and claimed loss of profits, which might have been made from the sale of ice during such period. The court held that such expected profits were too remote, contingent and speculative, and were not a proper measure of damages for such a breach.

The two principal elements of damages claimed by the plaintiff in this case, that is: a loss of profits and increase in cost of production would fall within the type of damages referred to in the above cases and would fall in the category of being speculative and too remote and not within the contemplation of the parties, and consequently not recoverable.

The plaintiff also claimed damages in the sum of $250 to the motor of the cutting machine, which damage resulted from the improper performance of the transformer in question. Assuming that the defendant breached its contract as claimed, this would certainly be a proper element of damage. However, the proof in support of this item of damage is too vague and indefinite to warrant any recovery based upon the same.

In view of the foregoing, this court is of the opinion that the defendant did not breach either of its contracts, A or B, and that in addition thereto the proof of damage was based upon elements too remote and speculative to be recoverable.

The judgment of the circuit court was therefore correct, and accordingly it is affirmed.

*Judgment affirmed.*