Otto Flug, Trading as Solo Manufacturing Company, Plaintiff and Counterdefendant-Appellee, v. Craft Manufacturing Company, Defendant and Counterclaimant, Appellant.

Gen. No. 46,273.

Opinion filed June 22, 1954. Released for publication July 9, 1954.

LORD, BISSELL & KADYK, of Chicago, for appellant; L. DUNCAN LLOYD, WILLIAM H. HILLIER, PATRICIA J. SCHWARTZ, and WILBUR S. LEGG, all of Chicago, of counsel.

EUGENE R. WARD, of Chicago, for appellee.

MR. PRESIDING JUSTICE SCHWARTZ delivered the opinion of the court.

The plaintiff Flug sued to recover for work done and tools and dies made and delivered to Craft in the pe-

riod from March to September 1951. Craft admits that all the items were ordered and the work done, but it counterclaims for damages in the amount of $130,000, principally loss of profits because of the failure of Flug to correctly make and deliver on time two progressive dies included as a part of Flug's claim. A progressive die is one which by a continuous operation stamps out a product from raw material. In other words, it makes for speedy mass production. The agreed price for the manufacture of these two progressive dies was $2,625. The case was heard by the court without a jury. The court gave plaintiff a judgment for such of the items as were not disputed, amounting to $6,001.96, but allowed nothing for the making of the progressive dies. Craft appealed from this judgment because of the denial of its claim for special damages. Flug accepted the judgment of the lower court and has filed no cross-appeal. We must therefore assume that the court found that the dies were not delivered in accordance with the contract, and the sole question before us is the measure of damages.

■ The basis of Craft's claim to special damages is that Flug was made aware, both by personal conversations and by a notation on the order for the two dies, that Craft had a contract with a third person which it was unable to perform because the dies were defective and that, therefore, it is entitled to the loss of profit on that contract and on one that was in prospect. The conversations were denied by Flug. There are other disputed issues of fact with respect to damages, but we must assume for our purposes that the trial court resolved them in Flug's favor. Moreover, we have examined the record and we are satisfied that such conclusions are not against the manifest weight of the evidence and should not be disturbed. "Where the

evidence is conflicting, the conclusions of the trial judge who saw and heard the witnesses and had advantages not possessed by the reviewing court, in judging the weight of their testimony, should not be disturbed unless clearly wrong." *In re Matter of Gleeson,* 1 Ill. App.2d 409, and cases there cited. Therefore, in the account of the transaction which now follows, we have in the area of disagreement accepted the testimony given by plaintiff and his witnesses.

On February 21, 1951, Craft entered into a contract with Russakov Can Company (hereafter called Russakov) which was producing gasoline cans for the United States Army, whereby Craft was to manufacture 750,000 sets of plugs and flanges for 29 cents a set. The flange is a flanged opening in a can. The plug is a stopper to close the opening. Delivery was to begin June 1, 1951, at the rate of 150,000 sets a month. Russakov's representatives, according to testimony on behalf of defendant, stated that if Craft's performance was satisfactory on the first contract, it would give Craft a second contract for an additional 500,000 sets. Craft not only manufactured such items as these, but in addition was capable of producing tools and dies. It had in its employ two men who appear to have had expert knowledge of diemaking—Roberts, its chief engineer, and Vanis, its production manager, a tool and die man who formerly worked for Flug. These two men, confronted with the problem of producing flanges and dies, concluded that if progressive instead of stationary dies were available, the work could be done more quickly and cheaply. However, no such dies had ever been made, and they consulted Flug, who had done work for them and whom they considered a good man for that purpose. Vanis told Flug that he and Roberts had figured it could be done and they asked

his opinion. Flug said he wanted to consider it. They gave Flug prints prepared by Craft of the required articles and after consideration Flug gave his opinion that it could be done. Vanis and Roberts discussed the design and function of the dies, concluded they would function, and approved them. Flug was given the order of March 8, 1951, and started work on the dies. On the bottom of the order were the words "Priority rating DO—08 Contract #DA 11-009 QM 6083 O. I. 7567-GS-51." Thereafter, Vanis had many conversations with Flug about the dies. Among other things it was Craft's responsibility to furnish tryout material, and there appears to have been some delay on Craft's part in that respect. The flange die was delivered to Craft by Flug May 28, 1951, and the plug die on July 26, 1951. They were found imperfect, which is common in a business where precision and the most minute accuracy is required. One of the complaints, for example, was that the progression in the plug die was off 40 to 50 thousandths. They were returned to Flug for reworking and the flange die was redelivered on June 8 and the plug die on August 24. The dies were set up at the Craft plant and tried out seventy to eighty times. One of Flug's men came there frequently and worked on them. This continued late into the Fall of 1951, when Craft finally undertook to work out the perfection of the dies on its own account. However, it did not notify Flug that it was doing so. He knew nothing about the claim that the dies were not workable until suit was filed. Craft produced 250,000 sets with the dies made by Flug, which it delivered to Russakov. 50,000 of these were returned. In March 1952, the contract with Russakov was cancelled and in the letter of cancellation Russakov gave Craft another order for 300,000 of the same items. No explanation for this curious pro-

cedure is offered in defendant's briefs nor was any offered on oral argument. We do not draw the inference that Craft was laying the basis for a suit against Flug and so desired to have the contract cancelled as a basis for damages, but it does appear from this that Russakov was substantially satisfied with the items it was getting, and, in our view, disposes of the contention that the alleged delay caused the cancellation. Craft continued to experiment with progressive dies and finally in 1952 succeeded in producing one which was satisfactory for the manufacture of flanges but not for plugs. Stationary dies had to be used for manufacturing the plugs. In the meantime Flug was making other products for Craft, and in the latter part of September 1951 Flug refused to take additional work offered him because Craft still owed him $9,000. The president of Craft told Flug that Craft was not in a very good position to pay bills at the moment and asked him to go along with them. He showed Flug a large pile of plugs and said that Russakov would not take them because their people were on strike. Nothing was said in these conversations with respect to alleged defects in the dies or their failure to produce.

From the foregoing we have come to these conclusions: (1) that from the outset it was recognized by both parties that the production of progressive dies for making flanges and plugs was experimental in its nature; that there was doubt as to whether they could be produced, and that the making of the dies was undertaken more in the nature of a joint experiment than as a contract for specific goods; (2) that Flug exercised care and diligence in doing the work and while the dies did not produce with the precision that was expected of them, nevertheless, a substantial quantity of flanges and dies were produced, delivered and accepted by Russakov; (3) that Flug had no notice of any contract between Craft and a third person, other

than the fact that the dies were to be used in the filling of a governmental order; that he did not know the amount of that order and had no idea that he might be incurring a liability for damages of $130,000 when he agreed to make the dies for $2,625; (4) that the making of the progressive die for the plug was apparently not possible with the skill and craftsmanship that either Flug or Craft had. On the basis of these conclusions of fact, is there any merit in Craft's counterclaim?

■ Craft relies upon sec. 15(1) of the Uniform Sales Act (Ill. Rev. Stat. 1953, ch. 121½, sec. 15(1) [Jones Ill. Stats. Ann. 121.19, subd. (1)]) which provides that there is no implied warranty as to the fitness of goods for a particular purpose, except where the buyer "expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment . . . ." Paragraph 6 of section 69 [Ill. Rev. Stats. 1953, ch. 121½, § 69, subd. (6); Jones Ill. Stats. Ann. 121.73, subd. (6)] of the Act provides that the measure of damages for breach of warranty is "the loss directly and naturally resulting, in the ordinary course of events, from a breach of warranty." Paragraph 7 provides that the loss, "in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty." Section 70 [Ill. Rev. Stats. 1953, ch. 121½, § 70; Jones Ill. Stats. Ann. 121.74] provides that "Nothing in the act shall affect the right of the buyer or the seller to recover interest or special damages in any case where by law interest or special damages may be recoverable . . . ." The law with respect to consequential damages, therefore, still rests on the decisions of the courts.

There are excellent opinions of great weight that chart the course of justice in this field. Chief among these in Illinois is *Hippard Coal Co. v. Illinois Power & Light Corp.*, 317 Ill. App. 47. In that case the plaintiff had a contract with the defendant power company for electrical energy for its coal mine. The plaintiff sought to recover losses incurred by reason of the increased cost for the mining of coal due to the defendant's failure to furnish electricity as contracted for. A verdict of the jury and judgment of the trial court found for the plaintiff. The Appellate Court reversed on two grounds: (1) that the contract did not cover the liability claimed; and (2) that even assuming it was broad enough, the damages sought by the plaintiff were not provable. A number of federal cases are there cited as precedents. Among them is *Howard v. Stillwell & Bierce Mfg. Co.*, 139 U. S. 199. In the latter case a manufacturing company contracted to put up mill machinery by a specified date. It brought an action against defendants to recover deferred payments past due. It had failed to comply with the contract, and the defendants in their counterclaim sought to recover $12,000 as profits expected to be derived from the sale of flour which they would have manufactured. The court held that since there was no express stipulation in the contract and no special circumstances from which an understanding as to loss of profits could be inferred, the claim would not be allowed.

The legal philosophy underlying damages for breach of contract was analyzed by Mr. JUSTICE HOLMES in *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U. S. 540, 543. In contract, as distinguished from tort, performance as well as damages is covered by agreement; that is to say, whatever a man is to pay because of a breach is such as should have been within the contemplation of the parties. But, as JUSTICE HOLMES pointed out, people when contracting contem-

64

plate performance, not breach, and hence say little or nothing as to what shall happen in the event of a breach. For this purpose, the law has worked out rules of common sense which have established "what the parties probably would have said if they had spoken about the matter." Whether the extent of liability was within the defaulting party's contemplation or not, it "should be worked out on terms which it fairly may be presumed he would have assented to if they had been presented to his mind." After analyzing various cases on this point, the court held that "mere notice to a seller of some interest or probable action of the buyer is not enough necessarily and as a matter of law to charge the seller with special damage on that account if he fails to deliver the goods."

In *Pusey & Jones Co. v. Combined Locks Paper Co.,* 255 Fed. 700 (1918), the court held that the purchaser of a paper-making machine who counterclaimed for loss of profits because of delay in delivery could not, on the principles stated in *Howard v. Stillwell & Bierce Mfg. Co., supra,* and *Globe Refining Co. v. Landa Cotton Oil Co., supra,* recover profits. In *Sanford Coal Co. v. Wisconsin Bridge & Iron Co.,* 293 Fed. 735, the defendant counterclaimed for damages for failure to deliver in time a tipple for defendant's coal mine, claiming that if the tipple had been supplied on time it could have mined 6,188 tons of coal during July 1920 and because of the insufficiency of the temporary tipple, only 3,670 tons were mined. The court held that such profits could not be recovered, following the rule laid down in *Pusey & Jones Co. v. Combined Locks Paper Co., supra.* This case was quoted with approval in the *Hippard* case, the court saying that the rule recognized in the federal cases has also been recognized in Illinois.

▆▆▆▆ Defendant has cited authorities in which profits were allowed and, of course, there are many such cases. It can well be a just measure of damages

where the product involved is in itself for sale on the market and, as a matter of fact, there is little difference between that and the general rule that the measure of damages is the difference in value between what is tendered and what was agreed to be delivered. There is also an area within which courts have at times as a matter of justice resorted to loss of profits as a measure of damages when there is no other measure or other damages are difficult to prove. Whatever may be the inducement, the purpose of the court is always to find a measure of damages which will be fairly compensatory to the vendee and not unjust to the vendor. The best statement of this is to be found in a case cited and relied upon by defendant, *Carroll-Porter Boiler & Tank Co. v. Columbus Mach. Co.,* 55 Fed. 451, 453 (C. C. A. 3, 1893). In that case there was an express representation of what a machine would do and a guarantee with respect to it. The court said:

"If the measure generally applicable where a warranty such as this has been broken were appropriate to the circumstances of this case, there could be no doubt of the correctness of all the rulings complained of; for it is well settled that ordinarily the sum recoverable is the difference between the price contracted to be paid for the article as warranted, and the market price of like articles at the time of the breach. Where, however, as in the present case, the article is one which could not be bought in the market, that standard cannot be resorted to; and some other, which shall be fairly compensatory to the vendee, and not unjust to the vendor, must, of necessity, be adopted."

From the foregoing cases, the following guiding principles appear. Before loss of profits can be used as a measure of damages, the contract should expressly or by implication from its terms contemplate such damages; the defaulting party must fairly be pre-

66

sumed to have understood the extent of his liability for loss of profits and to have assented thereto; and loss of profits when used as a measure of damages should be fairly compensatory to the vendee and not unjust to the vendor. In the instant case, the only reference to any contract which might involve a loss of profits is the notation on the order which showed that the dies were being made in connection with governmental work. That is clearly not enough to establish that thereby it was expressly or by implication agreed that damages for loss of profits was in contemplation. Craft argues that the making of dies is by implication notice that certain products were to be made therefrom and that profits would be lost. That is true, but it is by no means notice that such loss of profits were in contemplation as a measure of damages or sufficient to give Flug notice that a contingent liability of $130,000 might follow his acceptance of this order. If Craft contemplated any such liability, it was its duty to make it an express part of the contract or to have given express notice of its intention to hold Flug to that measure of liability. Lastly, to use this as a measure of damages for the construction of two dies at a cost of $2,625 is not just to the vendor. None of the tests are met by the facts in this case.

The decision in *Hippard Coal Co. v. Illinois Power & Light Corp., supra,* upon which we have relied, is called *dictum* by Craft insofar as it relates to the question of profits. We do not so regard it. In the case of *Larson v. Johnson,* 1 Ill.App.2d 36, we held that when a court decides a case on a certain number of grounds, it does not follow that because the first ground would have been sufficient, the others do not deserve equal recognition as a basis for the court's judgment. Our Supreme Court has held that even where the point may not be essential to the decision, nevertheless if it is a legal principle deliberately

passed upon by the court, it establishes a precedent. *Scovill Mfg. Co. v. Cassidy,* 275 Ill. 462, 470.

██ ██ One further claim of damages needs to be considered. That is the cost of the new plug and flange dies which Craft finally undertook to produce. If we were to allow such damages, it would mean that Craft would be entitled to an additional judgment for the difference between $5,413.57 and $2,625. As we have said, we consider that the making of the dies by Flug was in the nature of a joint experiment in which Flug and Craft co-operated. If Craft, upon finding that the plug dies did not work perfectly, had promptly set about getting new dies from another diemaker, there might be some basis for a claim based on the difference in cost. It did not do so. The trial court in denying Flug any compensation for the dies has applied a measure of damages that is most fair to Craft.

The law, it is often stated, undertakes to enforce the reasonable expectations which arise out of conduct, relations and situations. Roscoe Pound's Introduction to the Philosophy of Law, p. 189; Cardozo's Growth of the Law, p. 102. In the instant case, such expectations could not embrace the result Craft here seeks.

*Judgment affirmed.*

ROBSON, J., concurs.

TUOHY, J., took no part.