*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0159P (6th Cir.)
File Name: 00a0159p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MEDICAL BILLING, INC.,
　　　　　*Plaintiff-Appellee,*

REICH, SEIDELMANN &
JANICKI,
　　　　　*Plaintiff-Appellee/*
　　　　　*Cross-Appellant,*

　　　　v.

MEDICAL MANAGEMENT
SCIENCES, INC.; JAMES F.
THACKER; WILLIAM J.
DEZONIA, JR.,
　　　　*Defendants-Appellants/*
　　　　　*Cross-Appellees.*

Nos. 98-3561/3564

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 94-01567—Kathleen McDonald O'Malley,
District Judge.

Argued: December 13, 1999

Decided and Filed: May 8, 2000

Before:  MERRITT and SILER, Circuit Judges;
          BECKWITH, District Judge[*].

———————————

**COUNSEL**

**ARGUED:**  Daniel L. Brockett, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellants.  Christopher P. Johnson, BROBECK, PHLEGER & HARRISON, New York, New York, for Appellees.  **ON BRIEF:**  Daniel L. Brockett, Robin G. Weaver, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellants.  Christopher P. Johnson, Caryn G. Mazin, BROBECK, PHLEGER & HARRISON, New York, New York, for Appellees.

   BECKWITH, D. J., delivered the opinion of the court, in which SILER, J., joined.  MERRITT, J. (pp. 16-18), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

   SANDRA S. BECKWITH, District Judge.   Reich, Seidelmann & Janicki ("RS&J") is a radiology practice.  Until September 1992, Medical Billing, Inc. ("MBI"), which is owned by Drs. Reich and Seidelmann, performed billing services for RS&J and two other small affiliated practices.  In 1992, Medical Management Sciences, Inc. ("MMS") began soliciting RS&J's billing business.  In September 1992, MBI and MMS entered into three agreements.  The two of those agreements that are relevant to this appeal are the Billing Services Agreement and the Asset Purchase Agreement.

---

[*] The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

The proper standard of review of motions for judgment as a matter of law in the Sixth Circuit for diversity cases is the standard for a directed verdict employed by the state whose substantive law governs the action, in this case, Ohio. *See Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 645 (6th Cir. 1991). Under Ohio law, a court must consider the evidence in the light most favorable to the party against whom the motion is made, and may grant the motion only if, taking the evidence in this light, there is but one reasonable conclusion as to the proper verdict. *See id.*

It is not possible to say that there is only one reasonable conclusion as to the proper verdict in this case when the entirety of the evidence which the jury considered is examined. The decision of the jury should stand because the evidence shows that not only has neither party demonstrated that they are clearly in the right, but in fact both parties have called attention to each other's numerous mistakes and ambiguities both in word and in action. The jury heard the evidence and were in a better position to weigh its credibility than this court. In fact, the trial judge indicated that based on her review of the whole record the evidence was "somewhat equivocal," and indicated that if the parol evidence were included, then she believed the decision of the jury should stand. I agree, and for that reason I would REVERSE the decision of the district court vacating the jury's decision.

Pursuant to the Billing Services Agreement, MMS agreed to perform billing services for RS&J and the other medical practices formerly served by MBI. MBI agreed to pay MMS fifteen percent of the amounts it collected for services performed by RS&J. That percentage was well in excess of the market rate of 9.5%. MMS promised to perform billing and collection services and to remit payments received in a timely fashion.

Two other provisions of the Billing Services Agreement are of particular relevance here. MMS promised to pay MBI a volume bonus for amounts billed by RS&J in excess of their previous billings (hereinafter, the "Volume Bonus"). MMS also agreed to guarantee increased revenue collections and to pay MBI the difference between the amounts it guaranteed and the amounts it actually collected[1] (hereinafter, the "Collection Bonus").

Pursuant to the Asset Purchase Agreement, MMS agreed to pay MBI $2.7 million for its assets, which are described with particularity in Schedule 1 to the agreement. Then, in Schedule 9 to the Asset Purchase Agreement, the parties to the agreement allocated the purchase price as follows: $10,000 for certain used office furniture and $2.69 million for a "Covenant Not To Compete in any radiology billing services activity by MBI, its Shareholders, officers and other principals." The Covenant Not To Compete provision of the Asset Purchase Agreement provides as follows:

> Commencing on the Closing Date and ending on the expiration of the term or upon the termination for whatever reason of the Billing Services Agreement, seller, its shareholders and officers and other principals agree to not, on its own behalf or in conjunction with any other individual, company or other entity or person,

---

[1] The calculation of revenue collected was to be performed on the basis of a unit described in the agreement as a relative value unit or RVU.

directly or indirectly, manage, operate, control, be an agent for, participant in, or be connected in any manner with the ownership, operation or control of any corporation, partnership, proprietorship or other business entity primarily engaged in the provision of collection or billing services for radiology firms. This Covenant Not To Compete is the essence of the value of this agreement to MMS. Of the $2,700,000 payable hereunder, $2,690,000 is being paid for said Covenant Not To Compete.

While the Asset Purchase Agreement makes reference to the Billing Services Agreement, it does not recite that the two agreements are integrated or in any other fashion suggest that the terms or recitals of the Billing Services Agreement are incorporated in the Asset Purchase Agreement.

The agreements became effective in October 1992. The term of the Billing Services Agreement was 6 years.

In August 1993, sooner than one year after the effective date of the two agreements, MBI gave notice of termination of the Billing Services Agreement and accused MMS of failing to perform services as promised. The parties met to discuss the notice. One topic of discussion was MBI's entitlement to a Volume Bonus and a Collection Bonus. MMS alleged, and the jury that eventually tried the matter found, that Defendants Thacker and DeZonia, who are principals in MMS, induced MBI to withdraw its notice of termination by promising to abide by Arthur Andersen's calculations of RVU's in the future. In any event, MMS continued to perform billing services for RS&J after the meeting, giving rise to an inference, at least, that the Billing Services Agreement was not terminated in 1993.

In August 1994, Dr. Reich, a principal in both RS&J and MBI, sent a second notice of termination of the Billing Services Agreement. He accused MMS of failing to perform the promised services, in the manner promised, and of

Given that I believe the parole evidence was admissible, the district court's judgment as a matter of law should have been reviewed by taking into account all of the information that was before the jury when they made their determination. No party to this litigation has articulated to this court a clear equitable argument that they are in the "right." Medical Billing admitted in its paperwork to a potential buyer that the rate it was being charged under the Medical Management billing services contract was "above market," indicating that the company understood the game it was playing with Medical Management. In addition, the potential sale of the Reich, Seidelman & Janicki practice during the same month as their first attempt to terminate the Medical Management contract gives an observer pause as to their intentions, not to mention the evidence that Drs. Reich and Seidelman may have intended to pocket the $2.7 million and construct a reason to terminate as soon as possible. Finally, the jury seems to have found plausible the idea that Drs. Reich and Seidelman were attempting to hide from their partner Janicki the fact that they had been receiving premium rates, essentially skimming off the top of their radiology practice, and that they therefore wished for Medical Management to continue to bill at the above-market which they had been charging in order not to alert Dr. Janicki to the difference in pricing once the billing was outsourced.

Medical Management, in turn, indicated to the IRS that it purchased a covenant not to compete and some office furniture, not a "premium billing contract," showing their own knowledge that this was more than a purchase of the right to bill at a 15% rate--at least in form. The information which they were sanctioned for not disclosing to Medical Billing during this litigation also tends to show that they believed they had purchased a covenant not to compete. And, importantly, they have working against them a letter indicating that they understood the risk that they could lose the $2.7 million purchase price upon termination. The decision of the jury could not have been an easy one to make.

---

## CONCURRING IN PART, DISSENTING IN PART

---

MERRITT, Circuit Judge, concurring in part and dissenting in part. While I concur in Sections II.B. and II.C., I disagree with the majority's holding in Section II.A. that the district court should have entered judgment for Medical Billing on the basis that Medical Management was not entitled to the $1.8 million jury award because the Asset Purchase Agreement was unambiguous on its face. It is clear from Ohio law that unless facial ambiguities infected the Asset Purchase Agreement, parole evidence should not have been admitted and considered by the jury. It is my contention, however, that facial ambiguities did indeed infect these two documents.

The Billing Services Agreement clearly states that the services provided by Medical Management will be "in partial consideration for" the Asset Purchase Agreement. It is unclear from the face of the documents what was intended by that language. In addition, paragraph three of the section of the Asset Purchase Agreement outlining the obligations between the parties is entitled "Billing Services Agreement," and describes the billing services arrangement between the two parties. A jury could reasonably construe the inclusion of that paragraph as conditioning performance of the Asset Purchase Agreement on performance of the Billing Services Agreement, especially when combined with the language which indicates that the Billing Services Agreement was "partial consideration" for the Asset Purchase Agreement. I find the terms to be ambiguous on their face, and thus I would uphold the jury's verdict on the basis that it was not error for the jury to consider the extensive extrinsic evidence it had before it when it concluded that Medical Management was entitled to a $1.8 million jury award.

withholding the Volume and Collection Bonuses to which MBI was entitled under the Billing Services Agreement.[2] On that same date, MBI and RS&J initiated the lawsuit giving rise to this appeal. They claimed, primarily, that MMS had breached the Billing Services Agreement by failing to pay the Volume and Collection Bonuses.[3] MBI and RS&J also claimed that they had been fraudulently induced to withdraw the first notice of termination by MMS's officials' promise to be bound by Arthur Andersen's calculation of RVU's for purposes of determining the amount to which MBI was entitled by way of the Collection Bonus. The jury found that MMS had fraudulently induced MBI to withdraw the notice of termination and awarded MBI $289,000 in compensatory damages.

MMS asserted a counterclaim for breach of the Asset Purchase Agreement. MMS argued that the $2.69 million payment had been intended as an up-front payment by MMS of money it would earn back during the six-year term of the Billing Services Agreement by virtue of the 15% service fee, which was well in excess of the market rate. MMS alleged that Drs. Reich and Seidelmann wanted the deal to be structured in that fashion so that money would go to MBI, where they would collect it, rather than to RS&J over time in the form of lower billing services fees, in which case Dr. Janicki would share it. MMS claimed, on that basis, that it was entitled to the return of that portion of the payment that was attributable to the approximately four years remaining on the Billing Services Agreement when MBI terminated it.

At the summary judgment phase of the proceedings below and in the post-trial phase, the district court concluded that

---

[2] The Billing Services Agreement provided for termination by MBI upon failure by MMS to pay a Volume Bonus to which MBI was entitled.

[3] The jury agreed that MMS had failed to pay the Volume and Collection Bonuses to which MBI was entitled. It awarded MBI damages in excess of $900,000, and MMS has not appealed that award.

the Asset Purchase Agreement was ambiguous. The court did not specifically identify any ambiguities in the Asset Purchase Agreement but made references to inconsistencies between the Asset Purchase Agreement and the Billing Services Agreement. The court also made special note of the following provision of the Asset Purchase Agreement, which the district court termed an "integration clause":

> This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter of this Agreement and merges or supersedes all prior discussions, agreements and undertakings of every kind and nature between them with respect to the subject matter of this Agreement, and neither party to this Agreement may be bound by any condition, definition, warranty or representation other than expressly provided for in this Agreement.

On that basis, the court permitted a trial on MMS's counterclaim at which the parties presented extrinsic evidence of their intentions regarding the portion of the $2.7 million payment that was not intended as the purchase price for used office furniture.

MMS offered evidence that suggested that Dr. Reich, in particular, wanted an agreement pursuant to which RS&J would pay exorbitant billing fees that MBI would recoup through a large up-front payment from MMS. Such an agreement would inure to the benefit of Drs. Reich and Seidelmann, who owned MBI, at the expense of Dr. Janicki. MMS suggested that Drs. Reich and Seidelmann insisted on the ruse of a payment for a covenant not to compete in order to hide their true intentions. MMS offered circumstantial evidence to suggest that Dr. Reich later attempted to terminate the Billing Services Agreement because he wanted to sell RS&J's practice and the higher billing rate was causing RS&J's profits to be depressed.

beneficiary of the Billing Services Agreement. The district court's decision in that regard is **AFFIRMED**.

### III

For these reasons, the district court's decision on MBI's Rule 50(b) motion is **VACATED**, in part, and, on remand, the district court is instructed to enter judgment in favor of MBI with respect to MMS's claim for breach of the Asset Purchase Agreement. The district court's decision denying MMS's Rule 50(b) motion with respect to MBI's claim for fraudulent inducement is **REVERSED** with instructions to enter judgment in favor of MMS with respect to that claim. The denial of RS&J's Rule 50(b) motion with regard to its claim as an intended third-party beneficiary of the Billing Services Agreement is **AFFIRMED**.

### C.  RS&J's Claim for Breach of Contract

RS&J asserted a claim for breach of the Billing Services Agreement against MMS.  The basis for the claim was that RS&J was an intended third-party beneficiary to that agreement and that RS&J had suffered a loss as a result of the breach of the agreement by MMS.   The district court submitted the question of whether RS&J was an intended third-party beneficiary of the Billing Services Agreement to the jury, which found that it was not.   The district court denied RS&J's Rule 50(b) motion with respect to its claim for breach of the Billing Services Agreement.

RS&J contends that the district court should have granted it a new trial on its breach of contract claim because the jury's finding that RS&J was not an intended third-party beneficiary of the Billing Services Agreement was without support in the record and contrary to law.   We note, however, that the district court did not merely ask the jury whether RS&J was an intended third-party beneficiary, but it also asked whether RS&J suffered any damages from the breach of the Billing Services Agreement if it was an intended third-party beneficiary.   The jury gave a negative response to that question.   Accordingly, to the extent that the jury's finding concerning RS&J's damages finds support in the record, RS&J was not prejudiced, even if the jury incorrectly concluded that RS&J was not an intended third-party beneficiary of the Billing Services Agreement.[5]

Because we find support in the record for the jury's finding that RS&J did not suffer damages as a result of MMS's breach of the Billing Services Agreement, we conclude that the district court did not err in denying RS&J's Rule 50(b) motion with regard to its claim as an intended third-party

---

[5]It is, perhaps, noteworthy that RS&J did not object to the form of the interrogatories to the jury.

MBI offered evidence that suggested that the payment was, in fact, for a covenant not to compete.  In any event, however, the jury was persuaded that the payment had been intended as an up-front payment in exchange for a higher billing rate and awarded MMS damages in an amount representing the "unearned" portion of the up-front payment: $1,868,000.

RS&J also asserted a claim, as an intended third-party beneficiary, for breach of the Billing Services Agreement by MMS.  At trial, the jury found, in addition to the findings set forth above, that RS&J was not entitled to damages for MMS's breach of the Billing Services Agreement and that RS&J was not a third-party beneficiary of that agreement.

After the jury returned its verdict, the district court granted a motion pursuant to Rule 50(b) of the Federal Rules of Civil Procedure pursuant to which MBI argued that MMS was not entitled to damages for breach of the Asset Purchase Agreement.  The court continued in its belief that the Asset Purchase Agreement was ambiguous with respect to the nature of the $2.7 million payment.   The trial judge concluded, however, that the jury should not have been permitted to consider all extrinsic evidence but should have been limited to consideration of the parties' post-agreement course of conduct.  The court then concluded, based largely upon MMS's income tax return and 1993 financial statement, that MMS believed the payment to be for a covenant not to compete and not an up-front payment for an increased billing rate as the jury had concluded.  On that basis, the court concluded that MMS was not entitled to damages for the breach of the Asset Purchase Agreement. The district court declined to grant judgment as a matter of law with respect to RS&J's claim for breach of the Billing Services Agreement or MBI's claim for fraudulent inducement.

### I

MBI, MMS, and RS&J have appealed from the district court's orders and opinions.  The district court permitted

those appeals on an interlocutory basis. The issues are summarized here for the sake of clarity and ease of comprehension.

MMS appeals the district court's ruling on MBI's Rule 50(b) motion in which the court essentially set aside the jury's verdict on MMS's claim for breach of the Asset Purchase Agreement. MMS argues that the district court erred by considering grounds for relief under Rule 50(b) that were not raised in an earlier motion under Rule 50(a); by substituting its own judgment for that of the jury regarding which extrinsic evidence was critical; and by making its decision by considering only part of the evidence that was submitted at trial. MMS also appeals the district court's failure to set aside, on MMS's Rule 50(b) motion, the jury's verdict on MBI's fraudulent inducement claim. MMS contends that MBI failed to submit evidence of tort damages that are distinct from its damages for breach of the contract that was fraudulently induced.

RS&J appeals the district court's denial of its Rule 50(b) motion for judgment as a matter of law on the jury's findings that it was not a third-party beneficiary of the Billing Services Agreement and did not suffer damages as a result of its breach. RS&J contends that the jury's finding concerning its status as a third-party beneficiary was erroneous as a matter of law and that the evidence of record does not support the jury's finding that RS&J did not suffer damages as a result of MMS's breach of the Billing Services Agreement.

## II

A. MMS's Claim for Breach of the Asset Purchase
   Agreement

The district court applied Ohio law to the parties' contract claims. Under Ohio law, if the language of a contract is clear and unambiguous, a court may not resort to construction of that language. *See Hybud Equip. Corp. v. Sphere Drake Ins. Co. Ltd.*, 64 Ohio St.3d 657, 665, 597 N.E.2d 1096, 1102

that the jury was presented with evidence of damages flowing from the fraud.

The damages MBI identifies did not arise uniquely from MMS's fraudulent promise to rely on Arthur Andersen's calculations. The Billing Services Agreement entitled MBI to a Collection Bonus. If MMS failed to pay that bonus, whether because it manipulated the numbers provided to Arthur Andersen or for any other reason, it breached the Billing Services Agreement. MBI's damages for unpaid Collection Bonus money flow from that breach. Accordingly, the damages identified by MBI as supporting the jury's award on its fraudulent inducement claim are not of the type recognized as fraud damages under Ohio law.

This court perceives only one element of damages that could have arisen uniquely from the fraud. Because MBI was induced to withdraw its notice of termination of the Billing Services Agreement, it continued to pay MMS fifteen percent of the amounts it collected for services performed by RS&J until it finally terminated the Billing Services Agreement in 1994. To the extent that that rate was in excess of the market rate for similar services, the difference between fifteen percent and the market rate would constitute damages arising from MMS's fraud that did not also arise from its breach of the Billing Services Agreement.

MBI has not identified evidence of such damages that was introduced at trial, nor has it identified any other element of damages that flowed from the fraud but not from the breach of contract. Accordingly, the district court erred in denying MMS's motion pursuant to Rule 50(b) for judgment with respect to MBI's claim for fraudulent inducement. Its decision in that regard is **REVERSED** with instructions to enter judgment in favor of MMS with respect to the fraudulent inducement claim.

MBI contends that the issue is resolved by reference to the district court's instructions to the jury. Specifically, MBI identifies the following instruction:

> If you find fraud, however, and you also find that foreseeable damages flowed from that fraud, you may award all damages that you find to have been proven by the greater weight of the evidence, both direct and consequential. In this regard, I emphasize that any damages you award on this claim must proximately flow from the fraud and not from a breach of contract, if any, that you find occurred.

MBI argues that the district court's instruction was sufficiently clear that the jury's understanding that it could only award such damages as flowed from the fraud must be presumed. *See Morgan v. Shirley*, 958 F.2d 662, 668 (6th Cir. 1992)(citing *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985)). MBI's argument is correct if evidence of damages flowing from the fraud and separate from the damages flowing from the breach of contract was before the jury.

At trial, MBI introduced internal records from MMS related to the calculation of RVUs for 1993. Those documents, which were apparently prepared in mid-1993[4], reflect an estimation by MMS that MBI would be entitled to a Collection Bonus in excess of $700,000 for 1993. MMS did not pay MBI a Collection Bonus in that amount. MBI argues that the documents demonstrate that MMS had manipulated the data it provided to Arthur Andersen before it promised to rely on Arthur Andersen's calculations. On the basis of those documents and certain testimony related to them, MBI argues

---

[4]Those documents include actual collections for the first five months of 1993 and an estimate for June, giving rise to an inference that MMS created them after May 31, 1993 and before actual figures for June were available. An inference that the documents predated the promise upon which MBI's fraudulent inducement claim is based is permissible.

(1992), *cert. denied*, 507 U.S. 987 (1993); *Karabin v. State Automobile Mut. Ins. Co.*, 10 Ohio St.3d 163, 167, 462 N.E.2d 403, 406 (1984). Only where the language of a contract is unclear or ambiguous or the circumstances surrounding the agreement endow the language with special meaning will extrinsic evidence be considered to give effect to the parties' intentions. *See Shifrin v. Forest City Enterprises., Inc.*, 64 Ohio St.3d 635, 597 N.E.2d 499, syllabus (1992). Words in a contract must be given their plain and ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall content of the document. *See Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146, syllabus ¶2 (1978). This court reviews *de novo* the district court's rulings on Rule 50 motions. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

The Asset Purchase Agreement is not ambiguous as regards the nature of the $2.69 million payment by MMS. In both Schedule 9 and the Covenant Not To Compete provision of that agreement, $2.69 million of the purchase price is allotted to the covenant not to compete. Moreover, the covenant not to compete was unambiguously made effective only for the term of the agreement or until the Billing Services Agreement was terminated. No provision of the Asset Purchase Agreement required that a portion of the purchase price be refunded in the event that MBI terminated the Billing Services Agreement before the end of its stated term. Accordingly, the district court should have concluded that MBI was entitled to judgment with respect to MMS's claim for breach of the Asset Purchase Agreement on the ground that the agreement was unambiguous and did not require that MBI refund any portion of the purchase price.

In short, the Asset Purchase Agreement unambiguously provided that the purchase price was for used furniture and a covenant not to compete. MMS has not argued that MBI violated the terms of the covenant not to compete while the Billing Services Agreement was in effect. Accordingly,

MMS could not, as a matter of law, prove a breach of the Asset Purchase Agreement by MBI. The district court's decision on MBI's Rule 50(b) motion is **VACATED**, in part, and, on remand, the district court is instructed to enter judgment, consistent with this opinion, in favor of MBI with respect to MMS's claim for breach of the Asset Purchase Agreement.

### B. MBI's Fraudulent Inducement Claim

The jury found that MMS's principals, Thacker and DeZonia, fraudulently induced MBI to withdraw its first notice of termination by promising to be bound by Arthur Andersen's calculations of RVU's for purposes of establishing the amount of future Collection Bonus payments. After the trial, MMS moved, pursuant to Rule 50(b), for judgment as a matter of law with regard to the fraudulent inducement claim arguing that MBI failed to introduce evidence of damages arising from the alleged fraud that were distinct from its damages resulting from the breach of the Billing Services Agreement. The district court denied MMS's Rule 50(b) motion with regard to that claim.

MBI based its claim for fraudulent inducement upon the promise by MMS to abide by Arthur Andersen's calculation of RVUs for purposes of determining the Collection Bonus to which MBI was entitled. MBI presented evidence at trial from which the jury could have found that MMS was already manipulating the data provided to Arthur Andersen for the purpose of minimizing the Collection Bonus when that promise was made. On the basis of that evidence, the jury could well have concluded that MMS omitted to tell MBI that it intended to provide altered or inaccurate data to Arthur Andersen, even though that fact would have been material to MBI in considering whether to exercise its right under the Billing Services Agreement to terminate that agreement. To the extent that MBI was able to adduce evidence to show that it suffered damages as a result of that omission, apart from the damages it suffered as a result of MMS's breach of the Billing

Services Agreement, MBI would be entitled to recover the damages it proved. *See Cohen v. Lamko*, 10 Ohio St.3d 167, 169, 462 N.E.2d 407, 409 (1984)(elements of fraud under Ohio law); *Spencer v. Huff*, No. 97CA2543, 1998 WL 391948 at *3 (Ohio Ct. App. July 2, 1999)(elements of fraudulent inducement same as elements of fraud); *Binsack v. Hipp*, No. H-97-029, 1998 WL 334223 at *5 (Ohio Ct. App. June 5, 1998)(same).

MMS's specific contentions on appeal are that MBI did not adduce evidence at trial from which the jury could properly have concluded that MBI suffered damages as a result from the fraudulent inducement that were distinct from its contractual damages and that MBI did not offer evidence from which the jury could have determined the amount of those damages without speculating. In ruling on MMS's Rule 50(b) motion, the district court noted that MBI had argued that "it was virtually impossible to arrive at appropriate calculations in the face of MMS's largely untraceable and unreversible [sic] RVU manipulation." The court further noted that MBI had introduced evidence that MMS's manipulation of the RVUs was "neither fully traceable nor fully reversible." The district court denied MMS's motion for judgment as a matter of law pursuant to Rule 50(b) with regard to the fraudulent inducement claim.

MBI concedes that any award of damages to MBI arising from the fraudulent inducement must be separate and distinct from the damages awarded to MBI on its claim for breach of the Billing Services Agreement. Ohio law goes further by requiring that fraud damages be limited to the injury actually arising from the fraud. The tort injury must be unique and separate from any injury resulting from a breach of contract. *See, e.g., Davison Fuel & Dock Co. v. Picklands Mather & Co.*, 54 Ohio App.2d 177, 182, 376 N.E.2d 965, 968 (Ohio Ct.App. 1977). MMS contends that MBI did not prove any damages arising from the fraudulent inducement that were separate from MBI's contract damages.