**Dr. Gopal POTTI, Kamala Potti, Vinayak Potti, a minor, and Lakshmi Potti, a minor, Plaintiffs–Appellees, Cross–Appellants**

v.

**DURAMED PHARMACEUTICALS, INC., Defendant–Appellant, Cross–Appellee.**

**Nos. 90–3463, 90–3909.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 15, 1991.

Decided July 5, 1991.

Rehearing Denied Sept. 5, 1991.

---

Charles Mulvihill Meyer (argued), Santen, Shaffer & Hughes, Robert J. Gehring, Law Firm of Robert J. Gehring, Cincinnati, Ohio, for plaintiffs-appellees, cross-appellants.

R. Joseph Parker (argued), Marcia E. Voorhis, Taft, Stettinius & Hollister, Cin-

cinnati, Ohio, for defendants-appellants, cross-appellees.

Before MERRITT, Chief Judge, KENNEDY and JONES, Circuit Judges.

KENNEDY, Circuit Judge.

This is a breach-of-contract diversity case in which the plaintiffs—Dr. Gopal Potti, Kamala Potti, and their two minor children—were awarded almost $860,000 following a jury trial. Defendant Duramed Pharmaceuticals ("Duramed") appeals the judgment and the plaintiffs cross-appeal the District Court's denial of prejudgment interest. For reasons that follow, the judgment of the District Court is vacated and the case is REMANDED for a new trial.

## I. Background

Duramed is a public corporation located in Cincinnati, Ohio, engaged in the development, manufacture and sale of generic drugs. Dr. Gopal Potti was formerly employed by Duramed as its Vice President of Research and Development. Potti and his immediate family collectively own 80,015 shares of Duramed common stock, obtained through investment of capital in Duramed and its predecessor company. In September 1986, Duramed raised capital through an initial public offering of equity. In Ohio the sale of securities to the general public is regulated at both the federal level through the Securities Exchange Commission and at the state level through the Ohio Division of Securities ("Division"). The Division required that Duramed insiders who had purchased common stock at substantially less than the public offering price place that stock in escrow as a condition of the Division's approval of the public offering. Pursuant to that requirement, the plaintiffs' shares are held subject to an Escrow Agreement governing the terms of the escrow and the conditions for release of shares from escrow.

In early 1987, Gopal Potti became dissatisfied with his job at Duramed and decided to leave the company. Because his employment relationship with Duramed was governed by a written employment agreement, Potti and Duramed negotiated a Termi-

nation Agreement which was executed on April 30, 1987. Central to this case is paragraph 6 of that Agreement which provides as follows:

> 6. All of the shares of stock of Duramed owned by Dr. Potti, his wife and his two children shall be released and delivered to him free of escrow on or before September 30, 1987, provided however the company will use its best efforts through the employment of legal counsel and all other means to release the stock from escrow at the earliest possible date.

Although all the other terms of the Termination Agreement were honored by both Potti and Duramed, the plaintiffs have not yet received the escrowed stock.

The plaintiffs contend that paragraph 6 requires Duramed to cause the plaintiffs' shares to be released from escrow at the earliest possible date, but in any event not later than September 30, 1987. Duramed disputes this interpretation, asserting that the clause was not intended as a promise that the Pottis' shares would be released from escrow by any certain date. Instead, Duramed argues that it was only required to exercise its best efforts to secure the release of the Pottis' escrowed shares at the earliest possible date, with a target of September 30, 1987. According to Duramed, the "best efforts" proviso was intended to clarify the reference to September 30, 1987, by conditioning the release of shares on compliance with the terms of the Escrow Agreement.

The parties to the Escrow Agreement, dated September 23, 1986, are Duramed, the escrow agent, and various shareholders including the Pottis. The following provisions of that Agreement are important to the resolution of this case:

> ....The terms of this Agreement commence upon effectiveness of the registration application with the Division [Ohio Division of Securities] which is contemplated to take place in September 1986.
> ....

8. All Escrowed Shares shall be released by the Escrow Agent in accordance with the following terms:

. . . .

8.2 At such time as the Company has provided to the Escrow Agent and the Commissioner of Securities of the State of Ohio audited financial statements . . . showing fully-diluted net earnings . . . for 1 year showing such earnings of at least Twelve Percent (12% %) [of the public offering price for all shares issued pursuant to the registration referred to above]

. . . .

Duramed asserts that it has never satisfied the paragraph 8.2 financial test for release of the shares as required by the Escrow Agreement. Therefore, Duramed argues that although it has exercised its best efforts, release of the escrowed shares has remained legally impossible and there has been no breach of the Termination Agreement.

At trial Duramed asked the court to declare that the terms of the Escrow Agreement, particularly paragraph 8.2 outlining the conditions to be met for the release of shares from escrow, are unambiguous and to instruct the jury as to its meaning. Duramed contends that the "1 year" period of paragraph 8.2 commences *after* the initial public offering which occurred in late September 1986. The District Court disagreed, holding that the term "1 year" in paragraph 8.2 of the Agreement was ambiguous. The District Court allowed several witnesses to testify as to what time period was meant by the reference to "1 year." That testimony was conflicting as to whether the one year period would be July 1, 1986–June 30, 1987 or October 1, 1986–September 30, 1987. This evidence was harmful to Duramed's case in that it led to the inference that Duramed could have had plaintiffs' shares released from escrow, under the terms of the Escrow Agreement, after June 30, 1987, rather than September 30, 1987. This difference is significant because other evidence revealed that Duramed's earnings for the

period July 1, 1986 to June 30, 1987 were greater than 12% of the offering price but the earnings did not meet the 12% test thereafter due to reversing business fortunes.

At the close of the plaintiffs' case and again at the close of all the evidence Duramed moved for a partial directed verdict contending that no reasonable jury could find that Duramed had failed to exercise its best efforts to obtain the release of the plaintiffs' stock from escrow at the earliest possible date. Those motions were denied by the District Court. The case was submitted to the jury upon special interrogatories which were answered as follows: (1) Duramed was obligated, under the Termination Agreement, to use its best efforts to obtain release of the Pottis' escrowed shares at the earliest date possible after the April 30, 1987 Agreement, but by September 30, 1987 at the latest; (2) it was not legally impossible for Duramed to obtain the release of the Pottis' shares by September 30, 1987; (3) Duramed did not use its best efforts to obtain the release of the shares from escrow at the earliest possible date before September 30, 1987; and (4) the earliest possible date when Duramed should have obtained the release of the Pottis' shares from escrow was August 17, 1987. On the issue of damages, the jury found the value of the plaintiffs' stock as of August 17, 1987 was $10.25 per share and that plaintiffs also incurred other damages of $39,500.00 as a result of Duramed's failure to obtain the release of the shares from escrow at the earliest possible date. On February 27, 1990, judgment was entered in favor of the plaintiffs in the amount of $859,653.75,[1] with interest thereon from the judgment date.

Following the jury verdict the District Court entertained several motions from the parties. Plaintiffs filed a motion for an award of over $223,000 in prejudgment interest. The District Court denied the motion, finding that this was not a proper case, under either federal or relevant Ohio law, for the award of prejudgment interest. Duramed moved for judgment notwith-

---

**1.** ((80,015 shares × $10.25/share) + $39,500).

standing the verdict, or in the alternative, for a new trial, on the grounds that the verdict was against the clear weight of the evidence, that the District Court committed prejudicial error in failing to strike certain testimony interpreting paragraph 8.2 of the Escrow Agreement, and that it was prejudicial error to allow the jury to interpret paragraph 8.2 of the Escrow Agreement. Both of Duramed's motions were denied.

Duramed asserts four errors on appeal: (1) failure to grant Duramed's motion for a partial directed verdict at the close of plaintiffs' evidence; (2) failure to strike testimony interpreting paragraph 8.2 of the Escrow Agreement; (3) failure to give Duramed's proposed jury instruction No. 17 which would have prevented the jury from interpreting the critical Escrow Agreement terms; and (4) improper admission of evidence concerning $39,500 in consequential damages. The plaintiffs cross-appeal, arguing that the District Court erred in refusing to award prejudgment interest.

## II. Duramed's Appeal

### A. *Partial Directed Verdict*

At the close of the plaintiffs' evidence, Duramed moved for partial directed verdict solely on the issue of whether Duramed had failed to use its best efforts to secure the release of the Pottis' shares by September 30, 1987. Duramed makes the same argument to this Court that was unavailing below: that the evidence presented by plaintiffs was insufficient for any reasonable jury to find that best efforts were not expended by Duramed.

■ In this Circuit it is well established that a federal court sitting in diversity applies the standard for a directed verdict used by the courts of the state whose substantive law governs the action; in this case Ohio law. *Arms v. State Farm Fire and Cas. Co.*, 731 F.2d 1245, 1248 (6th Cir.1984); *Gold v. National Savs. Bank*, 641 F.2d 430, 434 (6th Cir.), *cert. denied*, 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981). Ohio courts require that a court presented with a motion for a directed verdict construe the evidence and all permissible inferences therefrom most strongly in

favor of the party against whom the motion is made and consider neither the weight of the evidence nor the credibility of the witnesses in disposing of the motion. *See, e.g., Lones v. Detroit, T. & I.R. Co.*, 398 F.2d 914, 919 (6th Cir.1968), *cert. denied*, 393 U.S. 1063, 89 S.Ct. 714, 21 L.Ed.2d 705 (1969); *Durham v. Warner Elevator Mfg. Co.*, 166 Ohio St. 31, 139 N.E.2d 10 (1956). Such a motion will be granted only if, after considering the evidence in this light, there can be but one reasonable conclusion as to the proper verdict. 166 Ohio St. at 36, 139 N.E.2d 10.

■ Duramed concedes that whether Duramed exerted its "best efforts through the employment of legal counsel and all other means" to release plaintiffs' shares from escrow is a question of fact. However, Duramed argues that at the close of plaintiffs' case their motion for a partial directed verdict should have been granted because plaintiffs had failed to produce evidence showing with some certainty what Duramed could have done, but failed to do, to obtain the release of the escrowed shares. Our review of whether there was evidence that Duramed did not use its best efforts must be based on the entire record, not just the record at the end of plaintiffs' case, because Duramed proceeded to offer evidence in its own defense. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2534, at 588–90 (1971); 5A J. Moore & J. Lucas, *Moore's Federal Practice*, ¶ 50.05[1] (2d ed. 1986). Although Duramed did renew its motion at the close of the evidence, the totality of evidence was sufficient to submit this issue to the jury.

Plaintiffs' evidence on the "best efforts" question consisted of testimony from Dr. Gopal Potti himself and Harry Santen, an attorney who negotiated the Termination Agreement on behalf of Dr. Potti. Both witnesses testified to the importance of the release of escrow provision and the considerable discussions with Duramed's principals and attorney about the need of Dr. Potti to receive his shares. Both testified that several possible means of obtaining the release of the escrowed shares were

discussed with Duramed, including contacting the Division of Securities to obtain an exception to the Escrow Agreement[2] or substituting other shares between plaintiffs and another shareholder. Whether the latter method would have been possible is questionable, but there was evidence that Duramed did not follow through on efforts to secure early release of the shares. The evidence was therefore sufficient to raise the reasonable inference that Duramed did not in fact use its best efforts to have plaintiffs' shares released.

### B. *Testimony of Michael Miglets*

Duramed contends that the District Court erred in failing to strike certain testimony of Michael Miglets, an employee of the Ohio Division of Securities. Duramed's primary defense was that the Escrow Agreement terms prevented the release of the plaintiffs' shares. To that end, Duramed introduced the Agreement and called Michael Miglets to explain what an escrow agreement was and why it was required by the Division. During direct examination Miglets was asked about the Escrow Agreement's requirements for release of shares from escrow under paragraph 8.2. The following relevant colloquy occurred:

> Q. [Duramed Counsel]. Mr. Miglets, under the terms of this escrow agreement in paragraph 8.2, when does the period referred to in that paragraph, the 12–month period, when does that begin to run?
>
> (Witness reading.)
>
> A. *At the earliest, twelve months after the public offering.*
>
> Q. Twelve months after the date of the agreement?
>
> A. Right.

(Emphasis added).

In response to those questions on direct examination, on cross-examination counsel for the plaintiffs asked Miglets a series of questions regarding the one year period of paragraph 8.2:

> Q. [Pottis' Counsel]. Okay. And when we're talking about "a year," we're talking about four quarters; aren't we?
>
> A. Yes.
>
> Q. And those four quarters would be September 30, '86; December 31st, '86; first quarter of '87; second quarter of '87, like that; wouldn't they?
>
> A. I'm sorry, I lost you.
>
> Q. The four quarters—
>
> A. Okay.
>
> Q. —four quarters would have been actually the third quarter of '86, fourth quarter of '86, first quarter of '87, second quarter of '87; correct?
>
> A. *Yes, it would be after the public offering. The quarters would—you start counting quarters then.*
>
> Q. September 30, 1986?
>
> A. Yes.
>
> Q. December 31st, '86?
>
> (Counsel for Potti writing on the chart.)
>
> Q. I don't write so well at this time, but can you read those, Mr. Miglets?
>
> A. Yes.
>
> Q. Those are the quarters we're talking about; correct?
>
> A. Right. The public offering would have been September 23rd, '86 and the first quarter following that would have been those four quarters.

(Emphasis added).

On redirect examination the question was raised again by counsel for Duramed and the District Court itself:

> Q. And, Mr. Miglets, if you would look at paragraph 8.2. I'm a little confused. I want to go over this one more time.
>
> .    .    .    .    .
>
> Q. Mr. Miglets, that paragraph refers to one year and two years. When does one year from September of 1986 run?
>
> .    .    .    .    .
>
> A. Four consecutive quarters.
>
> THE COURT: What was that?

**2.** Mark Holderman and Michael Miglets, Ohio Division of Securities employees, testified that the Division had discretion to waive the otherwise necessary earnings requirements of an escrow agreement in force.

THE WITNESS: Four consecutive quarters.

THE COURT: Four consecutive quarters starting with what, the quarter ending September 30th which would be immediately following, or would it be the quarter ending December 31st, the first full quarter following? I think that is what the question is about.

(Witness reading.)

THE COURT: You say it's four consecutive quarters. And now the issue is, which quarters?

THE WITNESS: I'm not the examiner on file, but after paragraph 8.1 indicating the first two quarters of '86, I would assume it would be the last two quarters of '86 and the first two quarters of '87.

THE COURT: All right.

The day after Miglets testified Duramed moved to strike that portion of his testimony purporting to interpret the "1 year" period for measuring earnings under paragraph 8.2. Duramed argued then, as it does before us, that the testimony was offered to contradict the clear and unambiguous terms of the Escrow Agreement and should not have been admitted. The District Court rejected this argument, finding that paragraph 8.2 of the Escrow Agreement is ambiguous and the jury could properly consider the evidence.

■ Under Ohio law, interpretation of written contract terms is a matter of law for initial determination by the court. *See Uebelacker v. Cincom Sys., Inc.,* 48 Ohio App.3d 268, 549 N.E.2d 1210 (1988); *Clarke v. Hartley,* 7 Ohio App.3d 147, 454 N.E.2d 1322 (1982). It is only when the relevant contract language is ambiguous that the job of interpretation is turned over to the fact finder, *see Bahamas Agric. Indus., Ltd. v. Riley Stoker Corp.,* 526 F.2d 1174, 1179 (6th Cir.1975), and the determination whether a contract is ambiguous is made as a matter of law by the court. *D.L. Baker & Co. v. Acosta,* 720 F.Supp. 615, 618 (N.D.Ohio 1989). We review the District Court's legal conclusion regarding ambiguity *de novo.*

■ Ambiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations. *See, e.g., Wells v. American Elec. Power Co.,* 48 Ohio App.3d 95, 548 N.E.2d 995 (1988). We disagree with the District Court that the Escrow Agreement is ambiguous regarding the commencement of the one year period under paragraph 8.2. The Escrow Agreement says that "[t]erms of this Agreement commence upon effectiveness of the registration application ... which is contemplated to take place in September 1986." The one year period of paragraph 8.2 is clearly a "term" of the Agreement, and, absent clear language to the contrary, it must therefore "commence" upon the effectiveness of the registration. It is beyond dispute that the registration was effective at the end of September 1986. While a simple reference to a one-year period might be considered susceptible to more than one reasonable interpretation, in this case the Escrow Agreement itself makes clear that the one year period of earnings required by paragraph 8.2 refers to one year's earnings subsequent to the public offering. This plain and unambiguous meaning of the Escrow Agreement is verified by the purpose of the escrow itself, which is to protect public shareholders by insuring that insiders may not withdraw their stock from the company until the company has reached and sustained a specified level of earnings *after* receiving funds from the public market.

■ Our conclusion that there is no ambiguity with respect to the critical language is not rebutted by the sometimes confused testimony of Michael Miglets regarding timing under the Escrow Agreement. Although the time requirements and earnings tests for releasing escrowed shares are mandated by the Ohio Division of Securities, Miglets was not a party to the Escrow Agreement nor was he involved in the drafting of the Agreement. Therefore, although he could testify as to what earnings requirements the Division might require or whether the Division could waive those requirements, Miglets could

not testify as to the meaning of the Escrow Agreement itself. The District Court erred in failing to strike that portion of Miglets' testimony purporting to interpret the one year period under paragraph 8.2 upon timely objection by Duramed. This error was magnified rather than rectified by the District Court's decision to allow additional testimony on the question from Mark Holderman, Miglets' supervisor in the Ohio Division of Securities.

Because the Escrow Agreement is unambiguous regarding the commencement of the one year period under paragraph 8.2, the District Court erred by failing to state the proper construction to the jury as a matter of law. *Scott v. Anchor Motor Freight, Inc.*, 496 F.2d 276, 280 n. 2 (6th Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 107 (1974). Although it was error to allow the jury to interpret the Escrow Agreement, we must still decide whether that error was nonetheless harmless. That inquiry involves an assessment of the likelihood that the error affected the outcome of the case. *See Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 157 (6th Cir.1988). The error was harmless only if we can say with fair assurance that the jury's findings were not substantially swayed by an error in interpreting the Escrow Agreement.

In their Answers to Interrogatories, the jury determined that August 17, 1987 was the earliest date on which the Pottis' shares should have been released if Duramed had exercised its best efforts. From this it seems likely that the jury decided, contrary to the clear terms of the Escrow Agreement, that the Agreement would allow the one year earnings test to commence on July 1, 1986—almost three months *before* the public stock offering—and end on June 30, 1987. The evidence at trial showed that Duramed had filed its financial statement for the period ending on June 30, 1987, an unaudited Securities and Exchange Commission Form 10–Q, on Friday, August 14, 1987. The jury apparently concluded that the Ohio Division of Securities would have approved the release of plaintiffs' shares from escrow on the following Monday, August 17, 1987, if Duramed had exercised its "best efforts." Because it is probable that the jury's decision was influenced by their erroneous interpretation of paragraph 8.2 of the Escrow Agreement, the District Court's error in failing to interpret the Escrow Agreement as a matter of law was not harmless.[3]

### C. *Proposed Jury Instruction No. 17*

In addition to asking the District Court to strike certain testimony of Michael Miglets, Duramed submitted a jury instruction which directed that the one year period under paragraph 8.2 of the Escrow Agreement commenced after the stock offering and ended on September 30, 1987. The District Court refused to include the requested instruction in the charge to the jury, adhering to the conclusion that the Escrow Agreement was ambiguous regarding the commencement of the one year period.

As we have held, the District Court erred in failing to instruct the jury as to the clear meaning of the Escrow Agreement. We decline to address the specific jury instruction proposed by Duramed, leaving it to the District Court, on remand, to devise a suitable instruction on this issue.

### D. *Consequential Damages*

Duramed argues that the District Court improperly allowed plaintiffs to present evidence of $39,500 in consequential damages. Those damages consist of expenses incurred by Dr. Gopal Potti in his efforts to start a new pharmaceutical company following his departure from Duramed. These included expenditures for legal and business consulting fees, travel, and recruitment. Duramed contends that, although it had knowledge that Dr. Potti desired to start a new company following his departure from Duramed, the expendi-

---

3. Although evidence was presented from which the jury could have decided that Duramed failed to use "best efforts" to obtain a *release* from the terms of the Escrow Agreement, the jury's choice of the date August 17, 1987 persuades us that it is likely that the jury was substantially influenced by an erroneous *interpretation* of the Escrow Agreement.

tures sought by Potti as damages were not contemplated by the parties at the time the Termination Agreement was executed nor were they proximately caused by Duramed's breach.

■ Ohio law is in accord with general contract law on the subject of consequential damages. A plaintiff is only entitled to recover such damages as arise naturally, *i.e.*, according to the usual course of things, from the breach or such damages as may fairly be supposed to have been in the contemplation of both parties at the time the contract was made. *See, e.g., Western Union Tel. Co. v. Sullivan*, 82 Ohio St. 14, 21, 91 N.E. 867 (1910); *Roesch v. Bray*, 46 Ohio App.3d 49, 51, 545 N.E.2d 1301 (1988). We accept the proposition that damages such as those sought by plaintiffs here are not those which can be considered "usual" or "natural" in the event of a breach of an employment termination agreement, even one which provides for the release of shares held in escrow. Therefore, plaintiffs must, in order to recover the special damages they seek, show that those damages can be reasonably supposed to have been within the contemplation of both Gopal Potti and Duramed at the time the Termination Agreement was executed.

■ The "contemplation" necessary for liability to attach is well stated in *Caple v. Crane*, 13 Ohio App. 317 (1920), as follows:

... [T]he contemplation of one of the parties is not sufficient; it must be a mutual and reciprocal contemplation produced by such particularity of attendant circumstances as should preclude both parties from saying that they were not, in effect, in law incorporated into the engagement.

*Id.* at 326 (quoting *Pusey & Jones Co. v. Combined Locks Paper Co.*, 255 F. 700, 708 (D.Wis.1918), *aff'd.*, 258 F. 989 (7th Cir.1919)). A plaintiff must show more than that the defendant had knowledge that performance was to be used for some purpose. *See, e.g., Caple*, 13 Ohio App. at 326–27 (finding no liability where breaching party had knowledge that property was to be used for a certain purpose but was "not admonished that the failure to convey would result in special damages."); *Markowitz & Co. v. Toledo Metro. Hous. Auth.*, 608 F.2d 699, 707 (6th Cir.1979) (finding liability where breaching party was "fully aware" at the time of contracting that if it failed to meet its obligations "the project would inevitably collapse" and the plaintiff would suffer damages).

In this case, there was some evidence indicating that Duramed was aware that Dr. Potti intended to use his escrowed shares to provide capital for a new company.[4] However, as we have indicated, mere knowledge on the part of Duramed that Dr. Potti intended some uses for the funds he anticipated receiving is insufficient as a basis for recovering consequential damages. At a minimum, Dr. Potti must demonstrate that Duramed could reasonably have understood at the time the Termination Agreement was executed that Potti, in anticipation of receiving his escrowed shares, would make the type of expenditures he now seeks to recover as damages and that those expenditures would likely be irrecoverable in the event of a default by Duramed.

There is also a problem with the plaintiffs' proof of causation of the consequential damages they seek. To recover the funds expended in the aborted attempt to start his new business, Dr. Potti must show that the business did not successfully start *because* of the failure of Duramed to obtain the release of the plaintiffs' escrowed shares. It is not clear that the plaintiffs understood their burden and, indeed, the District Court prevented Gopal Potti from

---

4. The following testimony was given by Dasan Potti, an officer of Duramed who participated in the negotiation of the Termination Agreement between Duramed and Gopal Potti:

[ATTORNEY FOR PLAINTIFFS]: ... With respect to the release of Dr. Gopal Potti's shares from the escrow, did he tell you what it is that he wanted?

[DASAN POTTI]: There were discussions on, I guess, needing the money to start a company or buying a home or, you know....

650

testifying as to this essential element.[5]

In summary, to recover these claimed consequential damages the plaintiffs must show that Duramed had more than mere knowledge of Dr. Potti's intent to use the escrowed shares in part to start a new business. In addition, the plaintiffs must prove that any breach by Duramed actually caused the claimed damages.

### III. Pottis' Cross–Appeal

The plaintiffs cross-appeal the District Court's denial of prejudgment interest on the jury award for breach of contract. Because we vacate the judgment for the plaintiffs, the cross-appeal is no longer properly before us.

### IV.

For the foregoing reasons, the judgment of the District Court is VACATED and this case REMANDED for further proceedings not inconsistent with this opinion.

---

5. The following colloquy occurred:
[ATTORNEY FOR PLAINTIFFS]: Did the [new] business ever start operations?
[GOPAL POTTI]: No.
THE COURT: Anything else?

[ATTORNEY FOR PLAINTIFFS]: Can you tell me why the business never started operations?
[ATTORNEY FOR DURAMED]: Objection.
THE COURT: Sustained.