# United States Court of Appeals for the Federal Circuit

2008-1170

THE EUCLID CHEMICAL COMPANY,

> Plaintiff/Counterclaim Defendant-Appellant,

v.

VECTOR CORROSION TECHNOLOGIES, INC.,

> Defendant-Appellee,

and

DAVID WHITMORE,

> Defendant/Counterclaimant-Appellee,

and

VECTOR CORROSION TECHNOLOGIES, LTD.,

> Counterclaimant-Appellee.

Thomas H. Shunk, Baker & Hostetler LLP, of Cleveland, Ohio, argued for plaintiff/counterclaim defendant-appellant. With him on the brief was Jude A. Fry, Fay Sharpe LLP, of Cleveland, Ohio.

Brewster B. Taylor, Stites & Harbison, PLLC, of Alexandria, Virginia, argued for defendant-appellee and defendant/counterclaimant-appellee. With him on the brief were Robert E. Scully, Jr. and Emily H. Smith.

Appealed from: United States District Court for the Northern District of Ohio

Judge Christopher A. Boyko

# United States Court of Appeals for the Federal Circuit

2008-1170

THE EUCLID CHEMICAL COMPANY,

 Plaintiff/Counterclaim Defendant-
 Appellant,

v.

VECTOR CORROSION TECHNOLOGIES, INC.,

 Defendant-Appellee,

and

DAVID WHITMORE,

 Defendant/Counterclaimant-
 Appellee,

and

VECTOR CORROSION TECHNOLOGIES, LTD.,

 Counterclaimant-Appellee.

Appeal from the United States District Court for the Northern District of Ohio in case no. 1:05-CV-080, Judge Christopher A. Boyko.

_____

DECIDED:  April 1, 2009
_____

Before NEWMAN, LOURIE, and LINN, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> LINN.  Opinion concurring in part and dissenting in part filed by <u>Circuit Judge</u> NEWMAN.

LINN, <u>Circuit Judge</u>.

This case involves a dispute over ownership of a United States Patent. Euclid Chemical Company ("Euclid") brought a declaratory judgment action concerning patents purportedly owned by Vector Corrosion Technologies, Inc. ("Vector"). Euclid Chem. Co. v. Vector Corrosion Techs., Inc., No. 1:05-CV-080 (N.D. Ohio Dec. 14, 2007), slip op. at 1. Vector counterclaimed for infringement and moved for partial summary judgment that it owned by assignment one of the patents-in-suit—U.S. Patent No. 6,217,742 (the "'742 patent")—based on a December 20, 2001 agreement (the "Assignment"). Id. at 2. The district court concluded that the Assignment unambiguously transferred the '742 patent to Vector, and it therefore granted Vector's motion. Id. at 6. The district court also held that the parties had either settled or abandoned all remaining claims, including Euclid's claim that it was a bona fide purchaser for value of the '742 patent. Id. at 8. Euclid appeals both aspects of the district court's judgment.

We conclude that the Assignment was ambiguous, and that the district court therefore erred by granting Vector's motion for partial summary judgment without considering extrinsic evidence of the parties' intent. Likewise, we conclude that the district court abused its discretion by dismissing Euclid's bona fide purchaser claim on the ground that Euclid had abandoned it. We therefore vacate and remand.

## I. BACKGROUND

Euclid's declaratory judgment action originally concerned six patents. In the first five counts of its complaint, Euclid alleged that it was entitled to a declaratory judgment of noninfringement and/or invalidity with respect to five patents, each of which Euclid alleged was exclusively licensed to Vector. See Complaint ¶¶ 18-42, Doc. No. 1-1, Euclid Chem. Co. v. Vector Corrosion Techs., Inc., No. 1:05-CV-080 (N.D. Ohio Jan. 14,

2005) ("Complaint").  Each of these five counts was resolved prior to appeal as the result of various judgments and settlements.  Euclid, slip op. at 1.

Euclid's two remaining counts are at issue in this appeal.  In Count VI, Euclid sought declaratory judgment that the Assignment did not transfer the '742 patent to Vector.  Complaint ¶¶ 43-53.  In Count VII, Euclid sought a further declaratory judgment that it was a bona fide purchaser for value of the '742 patent.  Id. ¶¶ 54-58.

Vector moved for partial summary judgment, arguing that it was the rightful owner of the '742 patent, by virtue of the Assignment.  Euclid, slip op. at 2.  The Assignment is a one-page document, dated December 20, 2001, and signed by Jack Bennett ("Bennett").  Bennett is the sole named inventor of the '742 patent.  See '742 patent at [76].  In full, the Assignment provides:

> I, JACK BENNETT, whose full post office address is 10039 Hawthorne Drive, Chardon, Ohio 44024, in consideration for $25,000.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged do hereby sell and assign to VECTOR CORROSION TECHNOLOGIES LTD. whose full post office address is 474 Dovercourt Drive, Winnipeg, Manitoba Canada R3Y 1G4, all my interest in the United States, Canada and in all other countries in and to my US, Canadian, and European applications for patents and issued US patent, namely:
>
> 1.  Issued US Patent 6,033,553.  This patent claims the specific use of $LiNO_3$ and $LiBr$ to enhance the performance of metallized zinc anodes;
>
> 2.  US Application No. 08/839,292 filed on April 17, 1997,
>
> 3.  US Application No. 08/731,248, filed on October 11, 1996 (now abandoned),
>
> 4.  EPO Application No. 99122342.1, filed November 9, 1999, and
>
> 5.  Canadian Application No. 2288630, filed November 8, 1999,
>
> any and all divisional applications, continuations, and continuations in part together with the entire right, title and interest in and to said applications,

any and to all divisional applications, continuations, and continuations in part thereof, the right to claim priority therefrom under the International Convention, and any and all Letters Patent which may issue or be reissued for said invention to the full end of the term for which each said Letters Patent may by granted; and hereby authorize the issuance to said assignee of any and all said Letters Patent not already issued as the assignee of entire right, title and interest in and to the same, for the sole use and benefit of said assignee, its successors, assigns or legal representatives; and hereby covenant and agree to do all such lawful acts and things and to execute without further consideration such further lawful assignments, documents, assurances, applications, and other instruments as may reasonably be required by said assignee, its successors, assigns or legal representatives, to obtain any and all Letters Patent for said invention and vest the same in said assignee, its successors, assignees or legal representatives.

SIGNED AT: Chardon, Ohio, U.S.A.

This 20th day of December, 2001

The '742 patent is a "[c]ontinuation-in-part of application No. 09/236,731, filed on Jan. 25, 1999, now Pat. No. 6,033,553 . . . ." '742 patent at [63]. However, the '742 patent issued on April 17, 2001—before the date of the December 20, 2001 assignment. Id. at [45].

The district court granted Vector's motion for partial summary judgment. Applying Ohio law, the district court reasoned that the Assignment was unambiguous, that the '742 patent was a continuation-in-part of U.S. Patent 6,033,553 (the "'553 patent"), and that "the plain and unambiguous language of the [Assignment] assigns all rights in the 553 patent and any and all continuations-in-part thereof." Euclid, slip op. at 6. Because the district court held that the Assignment was unambiguous, it concluded that it could not consider extrinsic evidence to interpret it. Id.

Addressing Count VII of Euclid's complaint, the district court noted that Euclid did not move for summary judgment on its bona fide purchaser claim, and instead only made arguments concerning its status as a bona fide purchaser in a footnote in its brief

in opposition to Vector's motion for partial summary judgment on ownership. Id. at 8. Because of this, the district court found that Euclid had "abandoned Count VII of its Complaint." Id. The district court concluded that no remaining claims were pending before the court, and it entered final judgment. Id. at 9.

Euclid timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II.  DISCUSSION

### A.  Assignment of the '742 Patent

The district court held that the Assignment unambiguously transferred ownership of all continuations-in-part of the '553 patent to Vector, including the '742 patent, even though the '742 patent had already issued. Specifically, the district court relied on the language of the Assignment assigning "Issued US Patent 6,033,553" along with "any and all . . . continuations in part together with the entire right, title and interest in and to said applications, any and to all divisional applications, continuations, and continuations in part thereof . . . and any and all Letters Patent which may issue or be reissued for said invention . . . ." Euclid, slip op. at 6. According to the district court, the "said invention" referred to in the Assignment is the invention of the '553 patent, and the '742 patent is unambiguously a continuation-in-part of that patent. Id. Euclid argues on appeal that the contract is, at best, ambiguous as to whether already issued patents are encompassed in the assignment.

"This court reviews a district court's grant of summary judgment de novo." Israel Bio-Engineering Project v. Amgen, Inc., 475 F.3d 1256, 1263 (Fed. Cir. 2007). "Construction of patent assignment agreements is a matter of state contract law." Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1370 (Fed. Cir. 2008). Under Ohio law:

When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement. We examine the [contract] as a whole and presume that the intent of the parties is reflected in the language used in the [contract]. We look to the plain and ordinary meaning of the language used in the [contract] unless another meaning is clearly apparent from the contents of the [contract]. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.

On the other hand, where a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent. . . .

Westfield Ins. Co. v. Galatis, 797 N.E.2d 1256, 1261 (Ohio 2003) (citations omitted and emphases added). Put another way, "[a]mbiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." Potti v. Duramed Pharms., Inc., 938 F.2d 641, 647 (6th Cir. 1991) (citing Wells v. Am. Elec. Power Co., 548 N.E.2d 995 (Ohio Ct. App. 1988)).

We disagree with the district court that the Assignment unambiguously transferred ownership of the '742 patent to Vector. The district court was correct that the language of the Assignment purports to convey "US Patent 6,033,553" and "any and all divisional applications, continuations, and continuations in part." Euclid, slip op. at 4. The district court was also correct that the '742 patent is a continuation-in-part of the '553 patent, as the Related U.S. Application Data on the face of the '742 patent makes clear. Id. at 6; see also '742 patent at [63].

The Assignment, however, also includes language that suggests that it was not intended to effect an assignment of the '742 patent. In particular, the Assignment specifically assigns all interest in and to the inventor's "US, Canadian, and European applications for patents and issued US patent." Notably, this language refers to

"applications"—plural—but "issued US patent"—singular. Had the assignee intended, through the assignment of "continuations in part" to assign other <u>issued</u> U.S. patents, it would be expected that the Assignment would have said that the inventor was assigning his "issued US patents"—plural—and even recited the patent number of the issued '742 patent.

At bottom, we cannot give the Assignment a "definite legal meaning." <u>Westfield</u>, 797 N.E.2d at 1261. Under one reasonable interpretation, the Assignment includes the '742 patent, because it issued from a continuation-in-part of the '553 patent. But under another reasonable interpretation, the Assignment excludes the '742 patent, because it was an already issued patent, not an application, at the time of the assignment. We therefore conclude that the Assignment is susceptible to at least two reasonable interpretations and is therefore ambiguous under Ohio law. <u>See</u> <u>Potti</u>, 938 F.2d at 647. Extrinsic evidence therefore should have been considered to ascertain the parties' intent. <u>See</u> <u>Westfield</u>, 797 N.E.2d at 1261.

In its brief on appeal, Euclid argues that substantial extrinsic evidence supports its view that the Assignment did not include the '742 patent. Specifically, Euclid points to evidence concerning Vector's recording of the assignment of the '553 patent but not the '742 patent, the inventor's payment of maintenance fees and attempted licensing negotiations after the date of the Assignment, and the subsequent execution of a different assignment by the inventor. Vector, however, has not yet had the opportunity or the obligation to challenge Euclid's extrinsic evidence or to bring forward its own evidence of intent. We therefore remand to the district court to allow that court to determine in the first instance—either through a subsequent motion for summary

judgment, or at trial—whether the Assignment, interpreted in light of relevant extrinsic evidence, transferred ownership of the '742 patent to Vector.

## B. Euclid's Bona Fide Purchaser Claim

The district court found that Euclid had abandoned Count VII of its complaint, which alleged that Euclid was a bona fide purchaser for value of the '742 patent. Euclid, slip op. at 8. In making this finding, the district court noted that Euclid did not move for summary judgment on its bona fide purchaser claim, and that the only arguments that it had presented to support that claim were made in an "educational footnote" in its brief in opposition to Vector's motion for summary judgment on the issue of ownership based on the Assignment. Id. In its briefing on appeal, Vector argues that the district court's finding was proper, because Vector had moved for summary judgment on the issue of ownership under the Assignment, and Euclid failed to meet its burden under Federal Rule of Civil Procedure 56(e)(2) to "set out specific facts showing a genuine issue for trial." In essence, Vector treats the district court's finding of abandonment as a grant of summary judgment in Vector's favor. Euclid responds that Vector never moved for summary judgment on Euclid's bona fide purchaser claim, and that Euclid was therefore under no obligation to come forward with evidence until trial. Euclid therefore characterizes the district court's action not as a grant of summary judgment, but rather as a dismissal of its claim for failure to prosecute.

We agree with Euclid that the district court's finding that it had abandoned its bona fide purchaser claim was effectively a dismissal for failure to prosecute, rather than a grant of summary judgment. Euclid's complaint presented two separate counts related to the '742 patent: Count VI sought a declaratory judgment that the Assignment did not transfer any rights in the '742 patent to Vector, while Count VII sought a

declaratory judgment that Euclid was a bona fide purchaser for value of the '742 patent. Vector moved for partial summary judgment on its claim of title pursuant to the Assignment, but it has identified no part of its motion for partial summary judgment that makes any mention of Euclid's bona fide purchaser for value claim. A party's obligation to "set out specific facts showing a genuine issue for trial" is triggered only when "a motion for summary judgment is properly made and supported." Fed. R. Civ. P. 56(e)(2). Here, Vector did not move for summary judgment on Euclid's bona fide purchaser claim, and the district court therefore could not properly have entered summary judgment against Euclid under Rule 56(e)(2).

We therefore construe the district court's judgment that Euclid abandoned its bona fide purchaser claim as a dismissal for failure to prosecute. Pursuant to Federal Rule of Civil Procedure 41(b), "[i]f the plaintiff fails to prosecute . . . a defendant may move to dismiss the action or any claim against it." Regional circuit law governs our standard of review of dismissals for failure to prosecute, Mitutoyo Corp. v. Cent. Purchasing, LLC, 499 F.3d 1284, 1290 (Fed. Cir. 2007), and the Sixth Circuit reviews such dismissals for abuse of discretion, Wu v. T.W. Wang, Inc., 420 F.3d 641, 643 (6th Cir. 2005).

In this case, the district court relied on two facts to conclude that Euclid had abandoned its bona fide purchaser claim: (1) Euclid "did not move for summary judgment on this claim"; and (2) Euclid's "arguments on [its] status as a [bona fide purchaser] were limited to a footnote in its Brief in Opposition to Defendants' Motion for Partial Summary Judgment and in its list of extrinsic evidence it asked the Court to consider when determining ownership of the 742 patent." Euclid, slip op. at 8. Neither

of these facts support the district court's conclusion that Euclid abandoned its bona fide purchaser claim.  As to Euclid's failure to move for summary judgment, it is clear that the failure to move for summary judgment on a claim does not indicate an intent to abandon that claim.  See, e.g., Mitutoyo, 499 F.3d at 1290-91 (holding that district court "abused its discretion by dismissing [a] claim for failure to prosecute under Rule 41(b)" when the court "relied heavily on the fact that [the plaintiff] did not move for summary judgment," because "failure to so move likely indicates [the plaintiff's] sense that issues of material fact exist, not an intent to abandon its . . . claim.").  Likewise, Euclid's failure to address its bona fide purchaser argument in detail in its opposition to Vector's motion for summary judgment cannot support dismissal for failure to prosecute.  As discussed above, Euclid was not obligated to come forward with any argument concerning its bona fide purchaser claim when Vector did not move for summary judgment on that claim.  Moreover, Euclid asserted its bona fide purchaser argument—albeit in what the district court characterized as an "educational footnote"—in response to Vector's separate summary judgment motion on the issue of ownership under the Assignment.  Euclid, slip op. at 8.  In these circumstances, we conclude that the district court abused its discretion by dismissing Euclid's bona fide purchaser claim.

## III.  CONCLUSION

For the foregoing reasons, we conclude that the Assignment was ambiguous and that the district court should have considered extrinsic evidence to determine whether the Assignment transferred ownership of the '742 patent.  We further conclude that the district court abused its discretion by dismissing Euclid's bona fide purchaser claim.  We therefore vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

<u>VACATED AND REMANDED</u>

COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

2008-1170

THE EUCLID CHEMICAL COMPANY,

Plaintiff/Counterclaim Defendant-Appellant,

v.

VECTOR CORROSION TECHNOLOGIES, INC.,

Defendant-Appellee,

and

DAVID WHITMORE,

Defendant/Counterclaimant-Appellee,

and

VECTOR CORROSION TECHNOLOGIES, LTD.,

Counterclaimant-Appellee.

Appeal from the United States District Court for the Northern District of Ohio in Case No. 1:05-CV-080, Judge Christopher A. Boyko.

NEWMAN, <u>Circuit Judge</u>, concurring in part, dissenting in part.

I agree that the district court erred in its grant of summary judgment, but I must, with all respect to my colleagues, dissent from their decision that the issue of contractual intent requires trial. The agreements transferring the Bennett patent property to Vector are clear that the only issued patent included in the transfer is U.S. Patent No. 6,033,553 ("the '553 patent"). The rules of contract and patent law do not

permit the interpretation that another patent on a different invention, a patent fully known to Vector, was nonetheless silently conveyed by these agreements. Since as a matter of law only one conclusion is reasonable, there is no need for prolongation of this litigation with its costs, delays, and burdens on parties and courts.

***The three contracts for the '553 patent and four patent applications***

It has long been known that metals such as zinc, when deployed in steel-reinforced concrete, can reduce corrosion of the steel by "galvanic cathodic protection."[1] Relevant to this dispute are two forms of this technology. In the first form, called "metallized" or "distributed" zinc anode technology, the zinc anode is distributed over the surface of the steel-reinforced concrete. This technology, as enhanced by use of lithium nitrate and lithium bromide, is the subject of the '553 patent, issued on March 7, 2000 to Jack Bennett.

The second form is called "embedded" or "discrete" zinc anode technology, wherein discrete anodes are embedded in the steel-reinforced concrete. This technology, with lithium nitrate and lithium bromide enhancement, is the subject of U.S. Patent No. 6,217,742 ("the '742 patent"), issued on April 17, 2001 to Jack Bennett. The '742 patent is identified as a continuation-in-part of the '553 patent, and contains new matter describing and claiming the lithium-enhanced embedded zinc anode technology.

On December 20, 2001 Mr. Bennett entered into three agreements with the Vector companies. Mr. Bennett is described as "a leader in the field of galvanic protection" and "an independent contractor of substantial reputation." Euclid App. Br. at

---

[1] This principle is attributed to Sir Humphrey Davy, who in 1824 attached chunks of iron to the hulls of copper-clad ships of the British Navy, and dramatically reduced corrosion of the copper. Euclid Br. at 12 (citing John P. Broomfield, Corrosion of Steel in Concrete: Understanding, Investigation and Repair (Taylor & Francis, 1997)).

2008-1170                                          2

2. He has had business dealings with both Euclid and Vector. Each of the three agreements lists the '553 patent and four patent applications, and describes the transferred subject matter as "the specific use of $LiNO_3$ and $LiBr$ to enhance the performance of metallized zinc anodes." The '742 patent excludes metallized zinc anodes from the scope of its claims.

The first agreement between Mr. Bennett and Vector, entitled "Patent Transfer Agreement," states the transaction as follows:

TRANSFER OF PATENTS AND PATENT APPLICATIONS APPOINTMENT

2. The Transferor hereby sells, transfers and assigns to the company all of his interest in the following patents and patent applications (all of which, and all rights, title and interests thereto, being collectively referred to in the Agreement as the "Patents"):

1. Issued US Patent 6,033,553. This patent claims the specific use of $LiNO_3$ and $LiBr$ to enhance the performance of metallized zinc anodes;

2. US Application No. 08/839,292 filed on April 17, 1997,

3. US Application No. 08/731,248, filed on October 11, 1996 (now abandoned),

4. EPO Application No. 99122342.1, filed November 9, 1999, and

5. Canadian Application No. 2288630, filed November 8, 1999.

The only issued patent on this list is the '553 patent. There is no mention of the '742 patent which had issued eight months before the contract was executed, no mention of embedded zinc anodes, and no end-clause referring to continuing applications, as in the third agreement.

The second agreement, entitled "Consulting Agreement," lists the same "issued US patent 6,033,553," again describes it as relating to "metallized zinc anodes," and

provides for consulting services for "the subject technology."  The agreement states in

relevant part:

> SERVICES
>
> 2.      The Consultant agrees that the services to be provided under this consulting agreement will be provided personally by JACK BENNETT.
>
> The Consultant further agrees that he will provide consultation to the Company relating to the application of the technology as described in the US, Canadian and European applications for patents and issued US patent as follows:
>
> > 1.      Issued US Patent 6,033,553.  This patent claims the specific use of $LiNO_3$ and LiBr to enhance the performance of metallized zinc anodes;
> >
> > 2.      US Application No. 08/839,292 filed on April 17, 1997,
> >
> > 3.      US Application No. 08/731,248, filed on October 11, 1996 (now abandoned),
> >
> > 4.      EPO Application No. 99122342.1, filed November 9, 1999, and
> >
> > 5.      Canadian Application No. 2288630, filed November 8, 1999.
>
> Services shall include transfer of technology, assistance with marketing and data, training, assistance with field applications, and any other questions relating to the subject technology that falls within the expertise and knowledge of the Consultant as of the date of execution of this Agreement.

Again, no mention is made of Bennett's separately patented process for lithium-

enhanced embedded anodes, the subject of the '742 patent, and there is no end-clause

as appears in the third agreement, entitled "Patent Assignment," following in its entirety:

> PATENT ASSIGNMENT
>
> I, JACK BENNETT, [address], in consideration for $25,000.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged do hereby sell and assign to VECTOR CORROSION TECHNOLOGIES LTD. [address] all my interest in the United States, Canada and in all other countries in and to my US, Canadian, and European applications for patents and issued US patent, namely:

1. Issued US Patent 6,033,553. This patent claims the specific use of $LiNO_3$ and $LiBr$ to enhance the performance of metallized zinc anodes;

2. US Application No. 08/839,292 filed on April 17, 1997,

3. US Application No. 08/731,248, filed on October 11, 1996 (now abandoned),

4. EPO Application No. 99122342.1, filed November 9, 1999, and

5. Canadian Application No. 2288630, filed November 8, 1999,

any and all divisional applications, continuations, and continuations in part together with the entire right, title and interest in and to said applications, and to all divisional applications, continuations, and continuations in part thereof, the right to claim priority therefrom under the International Convention, and any and all Letters Patent which may issue or be reissued for said invention to the full end of the term for which each said Letters Patent may be granted; and hereby authorize the issuance to said assignee of any and all said Letters Patent not already issued as the assignee of entire right, title and interest in and to the same, for the sole use and benefit of said assignee, its successors, assigns or legal representatives; and hereby covenant and agree to do all such lawful acts and things and to execute without further consideration such further lawful assignments, documents, assurances, applications, and other instruments as may reasonably be required by said assignee, its successors, assigns or legal representatives, to obtain any and all Letters Patent for said invention and vest the same in said assignee, its successors, assignees or legal representatives.

The district court accepted Vector's argument that the reference in this end-clause to "continuations in part" assigned the '742 patent to Vector, and declined to consider the evidence of contractual intent that Euclid proffered to show that this reading was incorrect. Although my colleagues, in an abundance of caution, remand for trial of contractual intent, it is quite clear that the only reasonable construction of these agreements is that they assigned the specifically listed '553 patent and four applications directed to metallized anode technology, and continuing or reissue applications and patents "for said invention," but did not assign the previously issued yet unlisted '742 patent for a different invention.

2008-1170 5

None of the three agreements mentions the '742 patent or embedded anode technology. This catch-all reference to continuing and reissue applications cannot be interpreted as assigning a patent that had issued eight months earlier on a different invention and whose existence was known to Vector.[2] The reference to "continuations in part" in the end-clause is directed to "said invention," the subject of the transfer and defined for the '553 patent as "enhanc[ing] the performance of metallized zinc anodes." The '742 patent is not for "said invention."

The distinct subject matter of the '553 and the '742 patents is stressed in the patents themselves. The '553 specification and claims are directed to metallized distributed anodes, while the '742 specification and claims are directed to embedded distinct anodes. The '742 specification describes the invention as for "embedded anodes comprised of individual elements that are spaced apart from one another, as opposed to distributed anodes that essentially cover the entire concrete structure surface." '742 patent, col. 3, lines 30-33. The claims of the '742 patent are founded on new matter that is not present in the '553 specification, and the '742 patent drew the explicit distinction from the metallized anode technology of the '553 patent.

Although my colleagues suggest that the reference to "continuations in part" in the end-clause of the third agreement introduced an ambiguity that warrants trial of contractual intent, that clause is not reasonably construed as assigning Bennett's '742 patent to Vector. Such a clause is not unusual in technology contracts, when the

---

[2] Mr. Whitmore, President of Vector Corrosion Technologies, Inc. and a defendant herein, testified that he knew of the '742 patent in "maybe June or July" following its issuance in April 2001. Whitmore Dep. at 124:18 (Dec. 13, 2006), filed with this court with Letter from Vector's Counsel (Aug. 6, 2008) to correct a misstatement at oral argument of this appeal.

parties agree that their deal includes future developments of "said invention," including patents that "may issue or be reissued." Such a prospective provision does not remove the obligation of contracting parties to identify the existing patent properties that are being assigned.

It is a truism of patent practice that transfers of patent property require specificity as to the property transferred. See, e.g., Estate of Paxton v. Comm'r, 44 T.C.M. (CCH) 771 (T.C. 1982) ("During all times herein, it was a well-established trade practice for patent lawyers to describe and identify inventions with specificity in legal instruments licensing the right to exploit, assigning or otherwise affecting property rights in the invention."); Poole v. Comm'r, 46 T.C. 392, 406 (1966) ("We have examined the Revolvex-Poole agreement of March 1, 1956, and find that it did not obligate Poole to assign the patent applications for the hinged bay window. The 1956 contract clearly identified by number the patent applications included in the contract and bound Poole to assign the patents on those applications only. The contract did not mention the hinged bay window.").

The practice requiring specificity of identification of transferred patents is so entrenched, that it would smack of misfeasance to have omitted the known '742 patent from the list of assigned properties, if the parties had intended that it be assigned. The now-asserted assignment to Vector of the '742 patent was never recorded in the Patent and Trademark Office, as authorized by 35 U.S.C. §261, although the assignment of the '553 patent was recorded within a few weeks after execution of the 2001 agreements. Vector also promptly recorded the assignment of the patent that issued in 2003 on U.S. Application No. 08/839,292, which is item No. 2 listed in the three contracts. Vector

obviously knew the rules of recordation, but did not place the asserted assignment of the '742 patent into position for recordation. PTO regulations state:

> An assignment relating to a patent must identify the patent by the patent number. An assignment relating to a national patent application must identify the national patent application by the application number (consisting of the series code and serial number, e.g., 07/123,456).

37 C.F.R. §3.21. Euclid also points out that Vector did not pay the maintenance fee that was due in 2004 for the '742 patent; Mr. Bennett paid the fee. These are not factual issues that require remand; they are undisputed matters of public record. See 37 C.F.R. §3.12 (assignment records are open to public inspection).

These actions are an unequivocal negation of contractual intent to assign the '742 patent to Vector in a 2001 agreement. It is not reasonable to conclude that the end-clause mentioning continuations "for said invention" was intended to assign a different, existing patent on a different invention. Even if the Patent Assignment agreement were remotely "susceptible" to this construction, it is not "rational and probable." See Graham v. Drydock Coal Co., 667 N.E.2d 949, 954 (Ohio 1996) ("Where the language of a contract . . . is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.").

In summary, the '742 patent is not mentioned in any of the three concurrent 2001 agreements although the '742 patent was issued and was known to Vector when these agreements were executed. The '742 patent was not a pending continuation-in-part application, but had issued eight months before the patent transfer contract was entered

into. The three agreements specifically list the '553 patent and four United States and foreign applications and describe the technology as metallized zinc anodes. No agreement mentions embedded anode technology, the subject matter of the '742 patent. The specification and claims of the '742 patent carefully distinguish the embedded anode technology of the '742 patent from the metallized distributed anode technology of the '553 patent, leaving no ambiguity as to the distinct inventions covered by these patents. It would not have been reasonable to list only the '553 patent if the Patent Assignment were intended to include the '742 patent. No reasonable construction of these contracts can include assignment of the '742 patent by silence.

The Ohio law of contracts views contract interpretation as a matter of law. Potti v. Duramed Pharms., Inc., 938 F.2d 641, 647 (6th Cir. 1991) (citing Uebelacker v. Cincom Systems, Inc., 549 N.E.2d 1210 (Ohio Ct. App. 1988)) ("Under Ohio law, interpretation of written contract terms is a matter of law for initial determination by the court."). While ambiguous contract terms warrant evidence of contractual intent, ambiguity exists "only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." Id. (citing Wells v. Am. Elec. Power Co., 548 N.E.2d 995 (Ohio Ct. App. 1988)); see also Graham, 667 N.E.2d at 954. Here, however, the only reasonable interpretation is that no contract assigned the '742 patent to Vector. See Hercules Inc. v. United States, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("[A] contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract."). There is accordingly no need for fact finding on the question of contractual intent, because the intent of the contracts is clear as a matter of law.

Applying the summary judgment standard of <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247 (1986), I would hold that the '742 patent was not assigned, for no reasonable jury could return a contrary verdict.  I would not prolong this litigation.